UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:18-CR-157-PLR-DCP |
| | ) | |
| JOSEPH STANTON, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Joseph Stanton's Motion to Suppress Evidence [Doc. 46] and Motion to Suppress Statements [Doc. 64], as amended [Doc. 77]. The Government has filed its responses in opposition [Docs. 52, 70, and 79]. On April 23 and 30, 2019, the Court conducted an evidentiary hearing on Defendant's motions.[1] Assistant United States Attorney ("AUSA") Cynthia Davidson appeared on behalf of the Government. Attorneys Page Pate and Norman McKellar represented the Defendant, who was also present. At the conclusion of the testimony, the Court took the matter under advisement and allowed the parties the opportunity to file post-hearing briefs. Defendant submitted separate post-hearing briefs on the suppression of evidence [Doc. 94] and the suppression of statements [Doc. 93]. The Government filed responses [Doc. 95 and Doc. 96] to Defendant's briefs, and Defendant filed replies [Doc. 97 and 98]. Accordingly, after reviewing the parties' briefs and arguments, the

---

[1] For ease of reference and citation, this Report and Recommendation will cite to the April 23, 2019 Transcript [Doc. 84] as "Tr. 1" and to the April 30, 2019 Transcript [Doc. 90] as "Tr. 2."

evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that both of Defendant's Motions to Suppress be denied.

## I.    INTRODUCTION

Defendant seeks to suppress certain statements he made to law enforcement officials, claiming that the statements were made in the course of plea negotiations, or alternatively, were not voluntary. [Doc. 93]. Beginning on October 31, 2017, Defendant was contacted by federal law enforcement regarding their investigation of an alleged marijuana distribution operation. Defendant subsequently cooperated in the federal investigation, during the course of which he made certain statements to law enforcement officials. More particularly, Defendant contends that his statements made during debriefings on March 5 and March 8, 2018 were made in the course of plea negotiations [*Id.* at 14 and 19]; the debriefings involved a state assistant district attorney as the prosecuting authority [*Id.* at 17]; and Defendant and his counsel reasonably believed they were engaged in plea negotiations [*Id.* at 19].[2] Alternatively, Defendant asserts that his advice from counsel that his statements made at the debriefing would not be used against him, as well as assurances from law enforcement that they "weren't looking to jam him up more" were "sufficient to overbear his will" and render his statements involuntary. [*Id.* at 23–24].

The Government alleges that Defendant's March 2018 statements were not made in furtherance of plea negotiations within the meaning of Fed. R. Crim. P. 11 or Fed. R. Evid. 410

---

[2] While Defendant initially moved to suppress "all statements made [] during his cooperation efforts with law enforcement in this case" [Doc. 77 at 13], the Government has agreed not use any statements that Defendant made during the September 26, 2018 interview with DEA task force officers or any statements Defendant may have made during his October 4, 2018 arrest, and has taken the position that statements made by Defendant at other times were not incriminating. *See infra* Section III (A).

2

[Doc. 96 at 3], and that his statements were not involuntary [*Id.* at 6]. Specifically, the Government argues that "Defendant's March 8, 2018 statement is admissible as the result of a non-custodial interview in the presence of defense counsel but no attorney for the government," and was not intended to be nor was a "plea discussion."[3] [*Id.* at 3]. Further, the Government contends that any offer of leniency by law enforcement officials was not coercive such that it rendered Defendant's statements involuntary. [*Id.* at 7].

On October 2, 2018, the federal grand jury returned an indictment charging Defendant with one count of conspiracy to distribute 1000 kilograms of marijuana and one count of conspiracy to commit money laundering. [Doc. 4]. At the time of Defendant's arrest at his residence on these federal charges, law enforcement conducted a search of the house and seized a duffel bag of U.S. currency and other items of evidence. Defendant additionally seeks to suppress and bar admission of the currency and other items seized, contending they were obtained during a warrantless search of his residence. [Doc. 94]. Specifically, Defendant maintains that the initial search of the residence was not justified as a protective sweep [*Id.* at 7]; the unlawful search of the residence tainted the subsequent consent to search given by Defendant's fiancé, Ms. Halie Norton, and her consent was otherwise involuntary [*Id.* at 11]; and Ms. Norton lacked the authority to consent to the search and seizure of the duffel bag. [*Id.* at 17].

---

[3] Defendant argues that his statements made during both the March 5 and March 8, 2018 debriefings should be suppressed. [Doc. 93 at 19]. In its Response [Doc. 96], the Government directly addresses the March 8, 2018 debriefing, but does not indicate that any statements were made by Defendant during the debriefing on March 5, 2018. *See* [*Id.* at 2–3]. The Court will address any statements made by Defendant during the March 2018 debriefings collectively as the Government has not definitively stated that Defendant made no statements during the March 5 meeting or specifically agreed that it will not use any statements that he may have made during that meeting against him.

3

The Government responds that the seizure of the duffel bag and other items of evidence was not in violation of the Fourth Amendment. [Doc. 95]. The Government insists that the initial search of Defendant's residence was a permissible protective sweep [*Id.* at 3]; Ms. Norton provided consent for the initial sweep of the premises [*Id.* at 4]; Ms. Norton's consent for the search of the residence was voluntary [*Id.* at 6]; and Ms. Norton had authority to consent to the search of the bedroom where the duffel bag was found under the bed [*Id.* at 9].

The Court will address these issues in turn following the summary of testimony at the evidentiary hearing.

## II. TESTIMONY AT THE EVIDENTIARY HEARING

In March 2017, Jerry Orr, a deputy sheriff with the Blount County Sheriff's Office ("BCSO") assigned to the Drug Enforcement Administration ("DEA") as a task force officer ("TFO"), ("TFO Orr"), opened an investigation into a marijuana distribution operation in Blount County, Tennessee and elsewhere. [Tr. 2 at 4]. The investigation started with information from a confidential informant concerning a large-scale marijuana operation involving David Wells ("Wells"), a codefendant in the instant case. [*Id.* at 5]. TFO Orr became aware of Defendant's involvement in the drug operation in September 2017, based upon evidence that was discovered as part of a homicide investigation that started in August 2017. [*Id.* at 5–6].

On August 12, 2017, Joe McCarter, a BCSO detective ("Detective McCarter"), was assigned to investigate a homicide that occurred in Blount County, Tennessee. [Tr. 1 at 61–62]. In furtherance of that investigation, Detective McCarter executed a search warrant on the house where the shooting occurred and found evidence of drug activity. [*Id.* at 62–63]. In September 2017, a search warrant was also executed on a storage unit located across the street, where

4

approximately 95 pounds of marijuana was discovered. [*Id.* at 63–65]. There were several air freshener deodorants in the storage unit, and a fingerprint analysis matched a print to Defendant. [*Id.* at 65]. In addition, on October 4, 2017, a trail camera[4] that had been installed as part of the investigation captured Defendant's vehicle at the storage facility on two occasions. [*Id.* at 66]. Detective McCarter shared this information regarding Defendant with TFO Orr. [*Id.* at 66–67].

On October 31, 2017, TFO Orr, TFO Nathan Stinnett, and Mike Davis, a special agent with the DEA ("SA Davis"), participated in a knock-and-talk with Defendant. [Tr. 2 at 9–10, 47]. TFO Orr described the purpose of the knock-and-talk as "try[ing] to get them to cooperate to help them later down in the road, because once you – once you arrest somebody, it's very hard for them to get back into the organization." [*Id.* at 9]. Further, TFO Orr stated that another purpose of the knock-and-talk was to look for cooperators to sign up as informants to make controlled buys. [*Id.* at 10]. At this point, Defendant was not charged involving the marijuana that had been discovered. [*Id.* at 9]. TFO Orr testified that when they arrived at Defendant's residence, Defendant's fiancé answered the door and advised that Defendant was asleep. [*Id.* at 11–12]. TFO Orr and SA Davis both said, "Well, we're with the federal government, and I think it would be best if he got up and c[a]me and talked to us." [*Id.* at 12]. Defendant went outside, and SA Davis identified himself as a DEA agent, and TFO Orr showed his credentials to Defendant. [*Id.* at 48]. TFO Orr testified that they told Defendant that they knew he was involved in distributing marijuana and that they were targeting Wells. [*Id.* at 12]. Defendant acknowledged being made aware of the homicide by Wells. [*Id.*]. When asked if he had been involved, Defendant replied, "[a]ll I did was I made a payment for a friend." [*Id.*]. SA Davis testified that Defendant made statements that he was aware

---

[4] The camera is referred to both as a trail camera and a deer camera in the Transcript.

5

of Wells distributing marijuana and advised that he was aware of a couple of associates to whom Wells supplied marijuana. [*Id.* at 151, 172].

Defendant was asked about cooperating in working with the government and making controlled buys from Wells. [*Id.* at 13, 151–52]. When asked what he said to Defendant to indicate that cooperation would be in his best interest, TFO Orr stated, "[t]hat when all the chips run and a case [was] closed, that if they – he was charged, then what cooperation that he gave us would be presented to either the ADA or the U.S. Attorney's Office for them to consider on how much cooperation he gets." [*Id.* at 48]. TFO Orr told Defendant that they had photographs of his vehicle in front of the storage facility leased by Wells and that they had discovered his fingerprint on the inside of the building. [*Id.* at 14]. Defendant stated, "[o]kay . . . I'll talk to you and I will help, but I don't want to do it here," and they gave him two hours to come to the DEA office. [*Id.* at 14–15, 50–51, and 151–52]. TFO Orr testified that during this knock-and-talk, he made no promise to Defendant that if he talked, his statements would not be used against him. [*Id.* at 15]. Further, TFO Orr made Defendant no promises of immunity from any prosecution. [*Id.*]. TFO Orr stated that the only motivation he used was to tell Defendant, "it's best that he got on board early and as quickly as possible, because the next time that he saw me, he'd come out of that house in handcuffs." [*Id.*].

Two hours after the knock-and-talk, Defendant arrived alone at the DEA office for the meeting. [*Id.* at 15–16]. TFO Orr, SA Davis, and Detective McCarter were in attendance. [*Id.* at 15]. Detective McCarter asked Defendant questions directed towards the homicide investigation. [Tr. 1 at 67 and Tr. 2 at 16]. Defendant identified a couple of the individuals who stayed at the house where the homicide occurred, and identified Wells as having lived at the house prior to

6

subletting it to the individuals. [Tr. 1 at 67–68]. There was also some discussion with Defendant about cooperating with the drug investigation, with Defendant asking what he could do and how it would benefit him. [*Id.* at 79–80]. SA Davis testified that they produced DEA Form 473, which is a contract utilized with informants, to discuss with Defendant, but he did not sign it. [Tr. 2 at 153 and 174].

When the discussion started getting more into Defendant's involvement with drug activity, Defendant stated that he wanted to talk to an attorney. [Tr. 1 at 68; Tr. 2 at 16]. TFO Orr testified that at that point, "we shook hands and said, 'That's your right. Let us know when you get a lawyer, and we'll be happy to sit back down.'" [Tr. 2 at 16]. Sometime afterwards, TFO Orr received a phone call from Kelly Tanner, an attorney in Knoxville, saying he represented Defendant and expressed an interest in setting up a meeting. [*Id.* at 20]. TFO Orr advised that he was in the middle of another operation and would call him back to set up a time and place to meet. [*Id.*]. There was no mention of cooperation during that phone call. [*Id.*].

In February 2018, Defendant was arrested on state charges of possession of marijuana with intent to resell. [Tr. 1 at 69]. Detective McCarter explained that they had held off on writing the warrant because their main concern had been the homicide investigation, but with the fingerprint identification, Blount County Assistant District Attorney ("ADA") Ryan Desmond advised them to obtain the warrant. [*Id.* at 69 and 82]. When Detective McCarter obtained the arrest warrant, he notified TFO Orr [*Id.* at 82]. Both TFO Orr and SA Davis were present during the arrest of Defendant on the state drug charges. [Tr. 1 at 82 and Tr. 2 at 154]. SA Davis testified that while present, he did not speak to Defendant [Tr. 2 at 154], and according to Detective McCarter, Defendant did not make any statements at the time of his state arrest. [Tr. 1 at 69].

7

It was also in February 2018 when Defendant went to the Garza Law Firm looking for new counsel. [Tr. 2 at 102]. Attorney Brandi Murrell testified that when Defendant met with her firm, he advised that he had been charged with a Class B felony and had been talking to Blount County and the DEA's office about cooperation. [*Id.* at 102–03]. Defendant told Ms. Murrell that his contact person was SA Davis. [*Id.* at 102]. When she reached out to SA Davis, he informed her that ADA Desmond would be the prosecutor for the state drug charges. [*Id.* at 103]. During her phone call with SA Davis, Ms. Murrell advised that Defendant would be retaining her firm as counsel, and that she was aware that the initial cooperation had not gone well. [*Id.* at 104]. She told SA Davis that Defendant was looking to begin fully cooperating, and later testified that SA Davis indicated that the DEA was still interested in his cooperation. [*Id.*]. Ms. Murrell then called ADA Desmond and informed him of her representation of Defendant and advised that they would be working with the DEA. [*Id.*].

Ms. Murrell testified that "[t]he biggest issue was that [Defendant]…was on unsupervised probation at the time out of Sevier County." [*Id.* at 104–05]. Defendant was close to the expiration of a six-year sentence, and if "he was going to work for the D[E]A and Blount County and help them, he needed to not be in jail in Sevier County." [*Id.* at 105]. SA Davis talked to Defendant's probation supervisor and asked that his probation not be revoked so that he could cooperate. [*Id.* at 65]. On or about February 23, 2018, Ms. Murrell followed up with ADA Desmond. [*Id.* at 106]. According to Ms. Murrell, ADA Desmond indicated, "I won't file a revocation or let Sevier County know that he's picked up these new [Blount County] charges so that he can stay out and work." [*Id.* at 105]. Further, he informed Ms. Murrell that he would send her early discovery, which she received on March 1, 2018. [*Id.* at 106–07]. ADA Desmond told Ms. Murrell, "if he's not going

8

to cooperate, I'll treat this like any other B felony. If he cooperates, I'll listen to [SA Davis] and do what they want." [*Id.* at 108]. Additionally, Ms. Murrell testified that she and ADA Desmond discussed that Defendant was not the main target of the joint investigation between the BCSO and the DEA, and that the investigation centered on Wells' drug activity and the homicide that occurred on his property. [*Id.*].

Ms. Murrell further testified that she and ADA Desmond discussed Defendant "being debriefed and being a source, and that he would listen and do what the DEA wanted," [*Id.*] adding that in state practice, it is implicitly understood that a defendant's statements will not be used against him. [*Id.* at 109]. Specifically, she stated, "what we typically do is, talk to the DA and then talk during the debrief and put it all on the table and say everybody is aware that this is in the course and scope of plea negotiations, it's not going to be used against you, but it can be used in further investigation. That's always discussed at the beginning of every debrief." [*Id.*]. Ms. Murrell confirmed that she was never granted any sort of immunity for Defendant in the state prosecution explaining, "[i]t was never promised that he would not be prosecuted, but it was discussed that his cooperation would not result in it not being treated like a regular B felony, that he would not be revoked out of Sevier County." [*Id.* at 131].

ADA Desmond related his recollection of discussions with Ms. Murrell, stating that he was aware that the federal authorities were interested in talking to Defendant, as well as multiple other individuals who were involved in the investigation. [*Id.* at 80]. He advised Ms. Murrell that if Defendant wanted to cooperate with the federal authorities, he "didn't have any strong feelings one way or the other as far as what happened with my charges in state court." [*Id.*]. While not ever reaching a formal offer, ADA Desmond suggested to Ms. Murrell that he would ultimately

9

dismiss the state charges if Defendant was fully cooperative. [*Id.* at 80–81]. He made no promises of immunity to Ms. Murrell, and stated that he had no discussion with her about whether any statement that Defendant made to anyone would be used against him. [*Id.* at 81–82]. He further stated, "[n]o one in my office, that I know of, was present or would have signed any sort of statement saying anything he used in that debrief could not be held against him. I'm not aware of anything like that. It would have been me who it would have gone through." [*Id.* at 82].

When asked whether there was there any expectation given to Ms. Murrell that Defendant's statements could potentially be used against him in the state case, ADA Desmond responded, "I would probably not have used anything that he said in his cooperation in the state case. I mean, we already had our charges against him, so we weren't looking to charge him with anything additionally." [*Id.* at 95]. ADA Desmond further confirmed that he was never involved with any discussion with an AUSA regarding whether or not he could negotiate plea discussions [*Id.* at 82], and never promised Defendant that he would not be charged federally. [*Id.* at 84]. He explained that it is a common practice between state and federal agencies that if an individual is charged and pleads guilty in federal court, the state case will be dismissed stating, "almost across the board the conversation with the defense attorney is basically we'll leave the case sitting there until their federal case is concluded, they're sentenced, and then I've never been in a situation where I haven't dismissed the cases at the end of that." [*Id.*].

Subsequently, Ms. Murrell called SA Davis, and advised that she was representing Defendant and that they wanted to come in and talk. [*Id.* at 19]. SA Davis testified that there were no discussions between he and Ms. Murrell about the parameters of the meeting; whether or not the meeting would be a proffer session; or whether or not any statements Defendant made during

10

this initial meeting would be used against him. [*Id.* at 156]. He further testified that he did not promise any form of immunity. [*Id.*].

The meeting occurred on March 5, 2018, and included Detective McCarter, TFO Orr, SA Davis, Defendant, Attorney Marcos Garza, and Ms. Murrell. [Tr. 1 at 70; Tr. 2 at 20–21]. Detective McCarter testified that SA Davis was involved in the meeting as to his investigation of Defendant's involvement with Wells. [Tr. 1 at 83]. No one from the Blount County prosecutor's office or the United States Attorney's Office ("USAO") was present at the meeting. [*Id.* at 70–71]. Ms. Murrell testified that at the beginning of such meetings, which she referred to as debriefs, she makes a blanket disclaimer that the information the defendant gives in the meeting is not going to be used against him, but can be used to investigate further crimes. [Tr. 2 at 111]. With respect to the March 5 meeting, however, Ms. Murrell stated she could not definitively say whether her notes from the meeting reflected that she made such disclaimer because she was no longer employed by the Garza Law Firm, and no longer had access to those notes. [*Id.* at 112].

Detective McCarter testified that he did not tell Defendant that his statements would not be used against him [Tr. 1 at 71], or make any promises of immunity. [*Id.* at 71, 85]. He further testified that ADA Desmond had not authorized him to engage in any sort of plea negotiation. [*Id.* at 70, 85]. TFO Orr similarly testified that there was no discussion about whether any of Defendant's statements would be used against him. [Tr. 2 at 22]. He added that neither he nor anyone else in that meeting was asked by Defendant's attorneys whether or not Defendant's statements would be used against him. [*Id.*]. He further confirmed that he was not authorized by Blount County or anybody from the U.S. government to negotiate any sort of plea. [*Id.*]. TFO Orr stated that the only thing they told Defendant is that "we would take his -- what he has done

11

as far as cooperation and present it to either the state ADA or the U.S. Attorney's Office, whichever one is there, and let them decide on any kind of cooperation agreement." [*Id.*].

Detective McCarter stated that Defendant could not provide any information pertaining to the homicide investigation, but he discussed some specifics about marijuana trafficking with the DEA. [Tr. 1 at 17]. He stated that Defendant was hesitant to discuss the details as to his involvement in any drug activity and that there were discussions between him and his attorneys during the meeting. [*Id.* at 71, 85–86; Tr. 2 at 21]. SA Davis also testified that Defendant was reluctant to talk about the marijuana organization. [Tr. 2 at 156]. Ms. Murrell testified that Defendant did not make any statements during the meeting that implicated himself in a marijuana conspiracy with Wells. [*Id.* at 112].

During the March 5 meeting, Defendant was asked to cooperate. [Tr. 1 at 87].[5] Detective McCarter testified that in terms of the discussion with Defendant concerning the Blount County charges, McCarter told Defendant that "if he's cooperative and honest, then I would go -- go to bat for him with the district attorney," but "it just depends on -- on what the district attorney wants to do." [*Id.* at 75]. Detective McCarter testified that Defendant was similarly told that how much his cooperation may help him would depend on what he could do and what the AUSA was willing to give him for consideration. [*Id.*]. At the end of the meeting, Ms. Murrell said that she would talk to Defendant further and get back in touch. [*Id.* at 71].

On March 6, 2018, Ms. Murrell sent an email to Detective McCarter stating that she had met with Defendant and was extending an apology for his reticence at the March 5 meeting. [Tr.

---

[5] When asked whether there were any discussions with Defendant at March 8, 2018 meeting concerning cooperation, Detective McCarter replied that he did not recall any, and felt it may have been at the earlier meeting. [1-74 and 89].

1 at 72; Tr. 2 at 23]; *see* [Exh. 5]. She explained that "[Defendant] has been highly concerned with the possibility of new charges arising out of any conduct discussed in the meetings. We have discussed that, and we are moving forward." [Exh. 5]. She also forwarded a copy of the email to SA Davis. [Tr. 2 at 158]. At the hearing, Ms. Murrell testified that Defendant was concerned that information divulged in the meetings would be used against him "[a]nd I explained to him that in debriefs, we have -- we're going to come to the table with all the information we have. You have to be open and share that information, and they're not going to use this information against you as long as you act in good faith." [*Id.* at 114]. When asked why Defendant would be concerned about statements being used against him if she had already made clear at the first meeting that they would not, Ms. Murrell answered:

> I believe because we were getting into new information that involved cross-state transactions. The old information was more about David Wells. And this would be information that implicated [Defendant] and Mr. Wells and things involving multiple states and could be federal in addition to state, which we were aware of by virtue of the fact that if the DEA is involved, if that amount of drugs is involved, it's always a possibility that it will go federal, and we'd already had that discussion. But he was just a little bit reticent.

[*Id.* at 115].

Ms. Murrell further testified that she told Defendant that "I've done these many times, and we've always had the cooperation results in that cooperation being taken into account in any kind of agreement, whether that agreement is reduction of charges or whatever it ends up being, that cooperation is taken into account." [*Id.*]. Ms. Murrell attached a PDF to her March 6 email outlining information from her conversation with Defendant regarding Wells. [Tr. 1 at 72–73]; [Exh. 5]. Detective McCarter testified that he felt the email was an effort by Defendant's counsel to try to get him into a position of cooperation. [Tr. 1 at 88]. He further testified that in regard to

13

this email, there was no discussion with Defendant's attorney regarding any sort of immunity, a Kastigar letter, or anything similar. [*Id*. at 73].

A second meeting with Defendant occurred shortly thereafter on March 8, 2018. [*Id*.]. In attendance were Detective McCarter, TFO Orr, SA Davis, Defendant, and Ms. Murrell. [Tr. 2 at 118]. There were no prosecutors from Blount County or an AUSA in attendance. [Tr. 1 at 74, 89]. At the meeting, Defendant went into much greater detail about Wells' drug activity and his involvement in that activity with cross-state transactions of California to Tennessee, including dates, amounts, method of transportation, sources, and locations. [Tr. 1 at 74; Tr. 2 at 24, 118]. He also identified several co-conspirators. [Tr. 2 at 24]. When asked if she was concerned in any way that what Defendant was telling the agents during these meetings could be used later in federal court, Ms. Murrell testified:

> Yeah. That was discussed during the debrief. When it -- when the topic of moving drugs from Tennessee to -- well, from California to Tennessee came up, I interrupted the debrief and said, 'Hey, we're getting into multistate issues, you know, we're getting into federal kind of issues. And we just want to make sure that we've got it on the table that he's bringing up a lot of things that implicate him both, you know, state and federally. And let's kind of make sure that we're not looking to jam him up.'

[*Id*. at 125]. She stated that the response was something along the lines of, "We're not looking to jam him up more. If he's truthful with us, then we're going to be okay." [*Id*.]. Ms. Murrell testified that she took this statement as an expression of good faith that they were not looking to charge Defendant federally [*Id*. at 133], but that she was never promised "in those exact words." [*Id*. at 138]. She further stated that SA Davis never told her "in those specific words" that no federal charges would be brought against Defendant [*Id*. at 140], only that he said, "[w]e're not looking to jam your client up. We understand that this happened along multiple states. We're

14

really out to get David Wells." [*Id.*].

SA Davis testified that "the terminology in terms of we wouldn't jam him up would reflect that he's going to get credit if he cooperates . . . [b]ut we don't know what level of credit that would be." [*Id.* at 163]. He further testified that he never promised Defendant that he would not be charged federally if he cooperated [*Id.* at 161]; never promised Defendant or his attorney that his statement would not be used against him if he cooperated [*Id.* at 61, 179]; and never made any promises of immunity from prosecution regarding Defendant [*Id.* at 163]. SA Davis stated that what they discussed with Ms. Murrell is that Defendant may get credit based on his level of cooperation, explaining that based on their cooperation, they advise the prosecutor, whether it be state or federal, who then determines the degree of leniency that they may get. [*Id.* at 161]. Further, SA Davis testified that it was his expectation during the meeting that the information provided by Defendant would be used in furtherance of the case against Defendant or possible coconspirators. [*Id.* at 181–82].

While Ms. Murrell stated that she did not have any expectation that what Defendant was telling the agents could later be used against him in a subsequent court proceeding [*Id.* at 118], SA Davis did not recall her giving any such indication during the meeting. [*Id.* at 184]. Both Detective McCarter and TFO Orr testified that there were no promises made at the meeting that Defendant's statements would not be used against him. [Tr. 1 at 74; Tr. 2 at 25]. Detective McCarter also stated that there were no promises of immunity made to Defendant. [Tr. 1 at 74]. TFO Orr added that there was no authorization either from the USAO or Blount County DA's office to negotiate any sort of plea. [Tr. 2 at 25]. He explained that he had not talked to anyone at the USAO at that point because it was early in the investigation. [*Id.* at 25]. He noted, however, that he made no

15

promise to Defendant that he would not take the investigation federally. [*Id*.]. TFO Orr testified, "[t]here was never a promise made to anybody about whether or not this investigation -- because that was our goal to go federal, if we got the cooperation and the historical information that we were looking for to go federally with the case." [*Id*.]. When Ms. Murrell was asked whether she told Defendant that he had immunity from federal prosecution, she replied, "[n]o, not in those words specifically." [*Id*. at 134]. She stated that she discussed with Defendant and the agents that his cooperation would be taken into account in the state case and in not bringing further charges. [*Id*. at 164].

Ms. Murrell acknowledged that she did not participate in any federal plea negotiations for Defendant [*Id*. at 147], explaining that she did not make any attempt to reach out to someone in the USAO about the case because there was no pending charge to negotiate and no existing case to discuss. [*Id*. at 126]. When asked whether it was typical for someone cooperating in a federal investigation to get charged and then sign a cooperation plea agreement, Ms. Murrell responded that she does not work on federal cases [*Id*. at 134] and had no basis of knowledge to know whether cooperators are always charged in federal court absent immunity. [*Id*. at 147]. SA Davis testified that in his experience, cooperators typically get charged in federal investigations as a matter of standard operation, but their cooperation is considered by the prosecutor. [Tr. 2 at 164]. Ms. Murrell testified that the agents did not ask for another debrief, and that she gave them the ability to communicate directly with Defendant about cooperating and "things like making buys, setting up . . . phone calls, making buys, those kind of things, not things that would implicate Defendant, but things that would implicate David Wells." [*Id*. at 119]. She was aware that Defendant became a documented confidential informant with the DEA, but she did not go with him to sign the

16

paperwork. [*Id.*].

Defendant signed the Confidential Source Agreement ("CSA") on March 14, 2018. [Tr. 1 at 89; Tr. 2 at 27]; [Exh. 6]. Detective McCarter, TFO Orr, and SA Davis were present. [Tr. 1 at 91; Tr. 2 at 27]. SA Davis went over the CSA with Defendant line by line. [Tr. 2 at 33 and 165]. He testified that he read the agreement to Defendant and that Defendant said he understood it. [*Id.* at 166]. The agreement provided in part as follows:

> In performing the investigative functions detailed above, I understand and agree to the following: I understand that my assistance to the DEA and any statements that I may make to my Controlling Investigators are entirely voluntary.
> …
>
> The DEA does not promise or agree to any consideration by a prosecutor or a court in exchange for my cooperation, since any decision to confer any such benefit lies within the exclusive discretion of the appropriate prosecutor and court. However, DEA will consider (but not necessarily act upon) a request to advise the appropriate prosecutor's office or court of the nature and extent of my cooperation with the DEA. I voluntarily waive any privacy requirement in any event that in the DEA's discretion that they may be legally required to disclose my identity in court.
> …
>
> I understand that I have no immunity or protection from investigation, arrest, or prosecution for anything that I say or do, except for activities specifically authorized by my Controlling Investigators pursuant to my cooperation with DEA. I agree to abide by the instructions of my Controlling Investigators and will not take any independent action on behalf of DEA or the United States Government.

[Tr. 2 at 31–32]; [Exh. 6]. They told Defendant that if he had a question about anything, they would stop and discuss before going forward. [*Id.*]. Defendant also had the opportunity to read over the agreement himself. [*Id.*]. The agreement was signed by Defendant, SA Davis, and TFO Orr. [*Id.* at 32]. TFO Orr testified that Defendant did not make any statements at that meeting. [*Id.*].

17

At the hearing, Ms. Murrell testified that she had discussions with ADA Desmond regarding Defendant's ongoing cooperation while the state criminal case was pending. [*Id.* at 120]. She detailed that on at least two occasions, she went to court with Defendant. The first was a general sessions court date for a status hearing when she advised ADA Desmond that Defendant was signed up as a confidential informant. [*Id.*]. Ms. Murrell asked ADA Desmond to keep the state case open so that Defendant could keep working, and Desmond agreed to reset it for another date in May. [*Id.* at 120–21]. Prior to the reset date, Ms. Murrell stated that she called SA Davis to confirm that he was still going to use Defendant as a confidential source and that Defendant was still working. [*Id.* at 121]. She explained that "[e]verybody was aware that we were working to get [Defendant] past that October 12th date to end his unsupervised probation so that he could stay out and keep working." [*Id.*]. At the second status setting on May 25, 2018, Ms. Murrell testified that she went to court in Blount County where there was a discussion in the courtroom about Defendant's continued cooperation. [*Id.* at 122]. She stated that she and ADA Desmond went to the back hall where he made a phone call to SA Davis from his cell phone to verify that Defendant was still working and in good standing. [*Id.* at 121]. Afterwards, they went back into court, where she waived the preliminary hearing, and the case was set for a plea by information in June. [*Id.*]. Ms. Murrell recalled a specific conversation with ADA Desmond to the effect that if Defendant's cooperation wasn't done by the plea date, they could continue to bump it out. [*Id.*].

As a part of Defendant's work as a confidential source, TFO Orr stated that the investigation planned a controlled purchase by Defendant from Wells. [*Id.* at 33]. He detailed that Defendant set up the marijuana purchase over the phone, but when he went to the prearranged location on the following day, Wells told him that he did not have any marijuana and would call

18

Defendant the next day. [*Id.* at 33–36]. Defendant made several attempted calls and texts to Wells, but Wells never responded. [*Id.* at 37]. Ultimately, Defendant never made any controlled purchases from Wells, and both TFO Orr and SA Davis testified that they learned from another confidential source that Defendant had talked to Wells and told him that the DEA was looking at them. [*Id.* at 37 and 165]. Wells admitted to TFO Orr that Defendant warned him about the undercover buy. [*Id.* at 39]. TFO Orr testified that this was considered a breach of Defendant's CSA [*Id.* at 37], which led to the termination of his agreement. [*Id.* at 39].

The form terminating Defendant's CSA was signed on July 6, 2018. [*Id.*]; [Exh. 6 at 4]. SA Davis made a notation on the line for the confidential source signature stating, "Can't Contact CS." [*Id.*]. SA Davis attempted to contact Defendant to advise that he was no longer working for DEA, but he was not able to reach him. [Tr. 2 at 39 and 186]. Ms. Murrell testified that she was unaware that the agreement had been terminated. [*Id.* at 122]. Subsequently, in September 2018, TFO Orr sent Defendant a text, testifying that he had forgotten that Defendant had been closed out as a confidential source. [*Id.* at 41]. He met with Defendant to have him identify a photograph. [*Id.*]. Ms. Murrell stated that she was not contacted about the meeting and "would never have allowed a client to go to that kind of meeting alone." [*Id.* at 124].[6]

TFO Orr went on to testify that on April 18, 2018, he talked with the USAO about referring the case for federal prosecution. [*Id.* at 37–38, 63]. SA Davis also participated in the presentation of the case to the USAO. [*Id.* at 166]. TFO Orr explained that they did a PowerPoint presentation and that the case was eventually assigned to AUSA Caryn Hebets for federal prosecution, with the

---

[6] The Government has agreed not to use any statements that Defendant made during the September 26, 2018 interview. *See supra* note 3.

case being opened in July 2018. [*Id.* at 38]. Defendant was arrested on federal charges on October 4, 2018.[7]

At the hearing, DEA Task Force Officer TFO Zachary Standefer testified regarding his involvement with Defendant's October 4, 2018 arrest, as well as the search of Defendant's residence. TFO Standefer explained that when he and other law enforcement officials from DEA and the Knoxville Police Department ("KPD") arrived at Defendant's residence, he and SA Davis went to the front door, while DEA SA James Blanton ("SA Blanton") and KPD Officers Kristen Cox and Jimmy Wilson went to the back door. [Tr. 1 at 8–9]. TFO Standefer first knocked and then rang the doorbell. He then heard commotion from the back and told SA Davis to wait there. [*Id.* at 9]. As TFO Standefer was running around the side of the residence, he slowed down when he heard the officers say that everything was okay. [*Id.*]. When he turned the corner, he saw Defendant laying in the grass, in the custody of SA Blanton. [*Id.* at 9, 23–24]. According to SA Blanton, Defendant came running out of the back door, and when given verbal commands, Defendant cooperated and went down onto the ground on his own. [*Id.* at 38]. TFO Standefer testified that he then saw Defendant's fiancé, Ms. Norton, inside of the doorway and asked her to grab her child and come outside. He asked her if there was anyone else inside, and she responded, "No, you're more than welcome to take a look." [*Id.* at 9, 25]

Ms. Norton testified that when she first realized the agents were present at her house, she was in her daughter's bedroom feeding her breakfast. [*Id.* at 46]. Her daughter's bedroom was located around the corner from the front door of the house. [*Id.*]. Ms. Norton stated that she heard

---

[7] The Government has also agreed not to use any statements that Defendant may have made during his October 4, 2018 arrest. *See supra* note 3.

knocking and yelling, and then saw the back door open, but she did not see Defendant. [*Id.*]. As she was trying to grab her daughter, Ms. Norton testified that an officer pointed a gun at her and told her to go outside because they were conducting a safety sweep to make sure no one else was in the house. [*Id.* at 46–47]. When asked why he felt there was a need to clear the residence after Defendant was already in custody, TFO Standefer responded that it was for the purpose of safety stating, "[i]t's just an automatic reaction. Training kicked in." [*Id.* at 25–26]. He explained that clearing the property involved looking for any person who could pose a threat to them by physically going into the room and checking anywhere someone could hide, including closets and under a bed. [*Id.* at 9, 27].

TFO Standefer testified that when they were clearing the bedroom, he noticed there was a duffel bag under the bed. [*Id.* at 27]. The flap of the bag was covered but not zipped, and he saw money in the bag. [*Id.* at 28]. He said to SA Blanton, "[t]here's a big bag of money under the master bed." [*Id.* at 29]. TFO Standefer further stated that bag was located at the corner of the bed and that he moved it over, but "once I knew there was no one under the bed, we moved on." [*Id.* at 28]. They left the bag in that spot while they finished clearing the house. [*Id.* at 29]. TFO Standefer explained that once an item is determined to be evidence, they are to "walk away, bring the person in to take the photograph, and then [ ] collect it as evidence." [*Id.*]. The bag was later photographed by TFO Jeremiah Johnson. [*Id.* at 30]; [Exhs. 2 and 3].

After clearing the house and finding no one else in the residence, TFO Standefer stated that they all went inside the residence "to try to make everything comfortable for the child." [Tr. 1 at 9–10]. He testified that Ms. Norton asked if she could get her child something to drink. Then, SA Blanton asked Ms. Norton if she lived at the residence and if she would consent to a search of it.

21

[*Id.* at 10]. While Ms. Norton stated she could not remember every detail of that day, she testified that before an agent asked her to sign the consent to search the home, they told her about finding a bag of money. [*Id.* at 48]. TFO Standefer did not recall any discussion with Ms. Norton about having found the duffel bag before seeking her consent to search. [*Id.* at 29]. Ms. Norton acknowledged living at the residence [*Id.* at 10], and she responded affirmatively to the request for consent to search the residence. [*Id.* at 10, 48, and 57].

A written consent form was retrieved, and SA Blanton reviewed the form with Ms. Norton while they were seated on the couch, reading it aloud to her and explaining that she could stop them at any time and that she did not have to give consent. [*Id.* at 10, 49]. Ms. Norton testified that she asked what would happen if she did not sign the form, but does not recall the agent's response to her question stating, "it literally went through one ear and out the other, because my nerves were, like, I was literally shaking." [*Id.* at 49, 52]. When asked whether she felt that she had the right not to give consent, Ms. Norton testified, "I was scared not to give them consent, because I had already seen a gun pointed at me when they first got there, and I was terrified." [*Id.* at 53]. But, she added, "I'm not going to sit here and say, like, I felt like they were going to shoot me if I didn't sign the piece of paper." [*Id.* at 58]. She further testified that while she was scared during her discussions with the agents concerning the consent to search, she remained "really calm." [*Id.*]. Ms. Norton affirmed that the agents were polite and nice to her when discussing the consent to search. [*Id.* at 55].

Ms. Norton acknowledged that she signed the consent form with her initials, and SA Blanton and TFO Standifer signed as witnesses. [*Id.* at 10 and 51]; [Exh. 1]. When asked if they were displaying firearms or being threatening towards Ms. Norton in any way during this time,

22

TFO Standefer responded that they had firearms on them, but they were holstered. [Tr. 1 at 12–13, 32–33]. He said that they were not being threatening and that Ms. Norton was calm, collected, and extremely nice throughout the process. [*Id.* at 12–13, 32]. He explained that they were trying to deescalate the situation so that child would feel comfortable, with some members of law enforcement removing their vests and tactical gear and placing them back in the car. [*Id.* at 12–13]. No agent attempted to gain consent for the search from Defendant, who was still on the scene in a patrol car during this time. [*Id.* at 33–34]. TFO Standefer explained that they have been trained to not ask people for consent once they are in custody because it is coercive in nature once someone is under arrest. [*Id.* at 39].

Upon search of the residence, TFO Standefer seized the large blue duffle bag from the master bedroom that contained a large amount of U.S. currency. [*Id.* at 13–14]; [Exhs. 2 and 3]. When he showed the bag to Ms. Norton, she denied having seen it before, and when he showed her where he found it, Ms. Norton said, "[t]hat's where Mr. Stanton sleeps. That side of the bed is where Mr. Stanton sleeps." [*Id.* at 14–15]. Ms. Norton testified that when they asked her to "sign the bag," she did not want to because she felt like she would be saying it was hers. [*Id.* at 49]. However, it was explained that, "No, we're not saying it's yours. You just have to sign it saying that it was concealed in front of you." [*Id.*]. Ms. Norton said that she signed the form although she felt uncomfortable because she had never seen the bag of money. [*Id.*].

## III.    ANALYSIS

Defendant initially moved to suppress "all statements made [] during his cooperation efforts with law enforcement in this case" [Doc. 77 at 13], claiming his statements were made under a grant of immunity, his statements were not voluntary, and that they were made in the

23

context of plea negotiations.  As discussed more fully below, Defendant now maintains that the only statements at issue stemmed from the debriefing sessions on March 5 and March 8, 2018, and that those statements should be suppressed on the basis that they were made in the course of plea negotiations, or alternatively, they were not voluntary.  [Doc. 93 at 14].  Defendant also moved [Doc. 46] to suppress any and all evidence seized from the search of his residence on October 4, 2018, asserting that the search was conducted without a warrant and was unreasonable, as well as that Ms. Norton did not voluntarily provide consent to search the residence.

### A.    Suppression of Statements

Defendant moves pursuant to Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f) to suppress certain statements he made to law enforcement officials, claiming that the statements were made in the course of plea negotiation, or alternatively, were not voluntary. [Doc. 93].  In his post-hearing brief, Defendant states that the Government indicated that it will not use Defendant's statements from the September 26, 2018 debriefing [Doc. 79 at 6], or his arrest on October 4, 2018 [Tr. 1 at 60–61], as well as that Defendant did not make any statements during his arrest in February 2018 [Tr. 1 at 70; Tr. 2 at 19] or when he was signed up to be a confidential informant on March 14, 2018 [Tr. 2 at 32–33].  *See* [Doc. 93 at 13].  Further, Defendant relates that the Government has previously taken that position that when law enforcement met with Defendant on October 31, 2017, his only statement was that he had done a "favor for a friend," and when meeting at the DEA offices, Defendant "expressed an interest in cooperating with the investigation but wanted to consult with his attorneys before making any statements."  [*Id.*]; *see* [Doc. 79 at 2–3, 7].  Therefore, Defendant maintains that the only statements at issue are those made by Defendant during the March 5 and 8, 2018 debriefings at the DEA offices ("March 2018

24

statements"). [Doc. 93 at 14].

### 1. Grant of Immunity

In his Motion to Suppress [Doc. 77], Defendant claims that his statements were made under a grant of immunity, as he asserts that he "was providing information to the Government as part of a cooperation effort arranged by his prior counsel and the prosecuting authorities." [*Id.* at 5]. While it appears that Defendant is not relying on a grant of immunity as a basis to suppress the March 2018 statements, the Court will briefly address the merits of this contention out of an abundance of caution.

Under *Kastigar v. United States*, when the government prosecutes a defendant who has been granted immunity under the federal witness immunity statute, 18 U.S.C. § 6002, statutory immunity "assures a witness that his immunized testimony will be inadmissible in any future criminal proceeding, as will be any evidence obtained by prosecutors directly or indirectly as a result of the immunized testimony." *United States v. Turner*, 936 F.2d 221, 223–24 (6th Cir. 1991) (citing 18 U.S.C. § 6002). Further, an individual may also be granted "pocket immunity . . . by way of assurances by prosecutors, either orally or by letter, to a potential grand jury witness that he will be immune from any prosecution based upon that testimony. Such decisions are made informally, outside the supervision of a court." *Id.* at 223; *see also United States v. Mendizabal*, 214 F. App'x 496, 501 (6th Cir. 2006) ("So called 'pocket immunity' (also called 'informal immunity') . . . hinges on the prosecutor's informal assurance of immunity; this approach bypasses the formalities required to grant statutory immunity.").

However, as the Court will later discuss, Defendant did not enter into any statutory agreement of immunity or informal agreement that he would be immune from charges.

25

"Foundationally, no prosecutor (or law enforcement agent) assured [Defendant] 'that he [would] be immune from any prosecution' based upon his cooperation." *See United States v. Adkins*, No. 5:16-CR-22-DCR-REW, 2017 WL 1855746, at *2 (E.D. Ky. Mar. 27, 2017) (quoting *Turner*, 936 F.2d at 223–24), *report and recommendation adopted sub nom.*, *United States v. Daugherty*, 2017 WL 1731700 (E.D. Ky. May 3, 2017). Further, as to any claims of pocket immunity, "normal contract law and remedies govern any alleged breach by prosecutors." *Mendizabal*, 214 F. App'x at 501. Defendant fails to point to "precise, exacting language" that he was promised by prosecutors, or even those believed to have the authority to offer immunity, that he was immune from prosecution. *See Adkins*, 2017 WL 1855746, at *2. Accordingly, the Court finds that Defendant's March 2018 statements were not made under a grant of immunity.

### 2. Plea Negotiations

Defendant contends that his March 2018 statements were made in the course of plea negotiations [Doc. 93 at 14]; the debriefings involved a state assistant district attorney as the prosecuting authority [*Id.* at 17]; and Defendant and his counsel reasonably believed they were engaged in plea negotiations [*Id.* at 19].

The Government maintains that Defendant's statements were not made in furtherance of plea negotiations, and thus are admissible "as the result of a non-custodial interview in the presence of defense counsel but no attorney for the [G]overnment." [Doc. 96 at 3]. Further, the Government asserts that Defendant lacked a subjective expectation that a plea was being negotiated, as there was "no indication that the defendant ever expressed any desire to resolve this case by way of a plea agreement." [*Id.* at 6]. In reply, Defendant asserts that "[b]y sitting down with law enforcement agents and proffering his involvement in an alleged drug conspiracy, Mr. Stanton and

his attorney clearly believed that he was engaged in the early stages of negotiating an eventual plea deal wherein he would plead guilty to a criminal charge and receive some form of leniency in exchange for his cooperation." [Doc. 98 at 5].

Federal Rule of Criminal Procedure 11(f) states that the admissibility of plea discussions is governed by Federal Rule of Evidence 410. Federal Rule of Evidence 410(a)(4) provides, in pertinent part, that evidence of "a statement made during plea discussions with an attorney for the prosecuting authority" is not admissible against a criminal defendant "if the discussions did not result in a guilty plea[.]"

Initially, Defendant asserts that the Government improperly argues that Rule 410 does not apply because there were no federal charges at the time the statements at issue were made. [Doc. 98 at 6]. The Government states that the challenged statements were not made as a part of plea negotiations, in part, because "[t]here was no federal case pending." [Doc. 96 at 1]. Here, the Court agrees with Defendant that the lack of a federal indictment on drug charges alone does not preclude a finding that Defendant was involved in plea discussion. *See United States v. Little*, 12 F.3d 215 (Table), 1993 WL 501570, at *3 (6th Cir. 1993) ("That Townsend had not yet been arrested or indicted at the time of the agreement does not preclude this finding [that the conversation was a plea agreement], as these events are not prerequisites to 'an offer to plead guilty upon condition.'"); *see, e.g.*, *United States v. Riedman*, No. 11-CR-6083CJS, 2014 WL 713552, at *21 (W.D.N.Y. Feb. 18, 2014) (rejecting "any contention that Riedman's statements may not be construed as plea negotiations merely because he had not yet been charged with a federal offense, especially because he was a current target of an ongoing federal investigation").

In *Little*, "the Sixth Circuit adopted the following test for determining whether the statement at issue occurred in the course of plea discussions: (1) whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion; and (2) whether the accused's expectation was reasonable given the totality of objective circumstances." *United States v. Benanti*, No. 3:15-CR-177-TAV-CCS-1, 2016 WL 6997494, at *13 (E.D. Tenn. Nov. 30, 2016), *aff'd*, 755 F. App'x 556 (6th Cir. 2018) (citing *Little*, 1993 WL 501570, at *3). Federal Rule of Evidence 410 "can be fairly read to apply to statements made to a government attorney during the course of plea discussions or to an agent whom the government attorney has authorized to engage in plea discussions." *United States v. O'Neal*, 992 F.2d 1218 (Table), 1993 WL 133807 at *8 (6th Cir. Apr. 28, 1993) (citing *United States v. Serna*, 799 F.2d 842, 849 (6th Cir. 1993); *United States v. Swidan*, 689 F. Supp. 726, 728 (E.D. Mich. 1988)).

Ultimately, the key issue before the Court is whether the alleged plea discussions, or Defendant's March 2018 statements, involved "an attorney for the prosecuting authority." *See* Fed. R. Evid. 410(a)(4). "It is the involvement of a government attorney in the negotiation *process*, not his physical presence at the debriefing, that triggers the application of Rule 410." *United States v. Ross*, 588 F. Supp. 2d 777, 782–83 (E.D. Mich. 2008) (emphasis in original). Here, Defendant claims that "many federal criminal cases begin exclusively at the state level or through joint state and federal investigations," and thus Rule 410 is applicable to the "proffer sessions" involving law enforcement "that involve very little substantive involvement by a prosecutor, if any." [Doc. 93 at 15]. Therefore, Defendant asserts that Rule 410 applies to bar his statements due to the level of involvement of ADA Desmond in the alleged plea negotiation process, as well as his and his counsel's belief that the investigating agents had the authority to embark in plea negotiations.

28

First, Defendant claims that ADA Desmond "played an active role in the investigation of [Defendant] and his subsequent prosecution on state charges . . . [as he] took affirmative actions to coordinate and facilitate [Defendant's] cooperation with the DEA while negotiating a potential resolution of the state charges" with Defendant's counsel. [Doc. 93 at 17–18]. For example, ADA Desmond testified that he became aware of Defendant through an initial debrief of an individual related to the homicide investigation, and knew there were "potential federal charges" for Defendant based on marijuana distribution. *See* [Tr. 2 at 89]. Defendant asserts that ADA Desmond initiated his arrest on state charges of marijuana distribution, agreed to delay or prevent his probation revocation, repeatedly delayed the state case to allow continued cooperation, as well as told Ms. Murrell that he would probably dismiss the state charges against Defendant following his federal cooperation. [Doc. 93 at 18–19].

The Court finds that ADA Desmond's involvement in enabling cooperation between Defendant and the investigating agents did not amount to the involvement of an attorney for the prosecuting authority in plea discussions. While ADA Desmond stated he would assist in Defendant's probation not being revoked, as well as delayed scheduling in Defendant's state case, he was not involved in any plea negotiations related to Defendant's cooperation. ADA Desmond testified that he suggested to Ms. Murrell that if the federal authorities told him Defendant was fully cooperative with the investigation and "they go to bat for him," he would ultimately dismiss the state charges. *See* [Tr. 2 at 80–81]. However, ADA Desmond also stated that he made no promises of immunity to Ms. Murrell or had any discussions regarding whether Defendant's statements could be used against him, as well as that it is common practice between state and federal agencies that if an individual pleads guilty in federal court, then the state case will be

29

dismissed.  [*Id.* at 81–82, 84].  Additionally, ADA Desmond testified that he was never involved in any discussion with an AUSA regarding authority to negotiate a plea deal, and never made any promises to Defendant that he would not be charged federally.  [*Id.* at 82, 84].  Ultimately, ADA Desmond only supported Defendant's involvement in the federal investigation by assisting in the scheduling of Defendant's state case, and delaying resolution of Defendant's state charges until the completion of Defendant's cooperation with the federal investigation and the conclusion of any federal charges.

In *United States v. Swidan*, cited by Defendant and the Sixth Circuit in *O'Neal*, the Eastern District of Michigan stressed that the purpose of Rule 410 is to "protect the plea discussion process," and held that defendant's statements to DEA agents were conducted during plea negotiations where the investigating agent was found to be a middle man between the prosecutor and the defendant.  689 F. Supp. 726, 727–28 (E.D. Mich. 1988).  The court in *Swidan* found that the defendant had a subjective expectation that he was negotiating a plea, which was reasonable under the circumstances, in part because the defendant "expected more lenient treatment in exchange for cooperating with the government." *Id.* at 729.  Additionally, the "agent testified that he was interested in the deal and informed the Assistant United States Attorney of the offer, who in turn relayed the offer to defendant's attorney," facts which are not present in Defendant's case. *Id.* at 727.  Similarly, in *Ross*, the Eastern District of Michigan found that "it [was] apparent that an AUSA authorized and approved the meeting," as "[t]here is little doubt that the discussion was sanctioned—and maybe even initiated—by an attorney for the government."  588 F. Supp. 2d 777, 783 (E.D. Mich. 2008).

30

In the present case, no prosecuting attorney—including ADA Desmond—was involved in negotiations with TFO Orr, Detective McCarter, or SA Davis regarding a potential plea negotiation with Defendant. While Defendant claims that ADA Desmond was involved in negotiating his state charge, ADA Desmond testified that he had already charged Defendant and was not looking to bring any more charges. [Tr. 2 at 95]. Ms. Murrell similarly testified that she was never promised any immunity for the state prosecution, "but it was discussed that his cooperation would result in [Defendant's] case not being treated like a regular B felony." [*Id.* at 131]. However, ADA Desmond stated that he followed the common practice that if Defendant cooperated in the federal investigation, the state charge would be dismissed following the conclusion of the federal case. [*Id.* at 84].

Additionally, Defendant argues that "ADA Desmond also delegated substantial authority to the agents to negotiate an eventual resolution of the case." [Doc. 98 at 4]. However, the investigating agents were not conducting plea negotiations with Defendant; rather, they attempted to recruit Defendant to assist in the investigation of Wells and stated that they would present Defendant's level of cooperation to the prosecuting authorities.

When discussing Defendant's cooperation at the October 31, 2017 knock-and-talk, TFO Orr testified that he initially told Defendant that cooperation would be in his best interest because after the investigation was closed, and "he was charged, then what cooperation that he gave us would be presented to either the ADA or the U.S. Attorney's Office for them to consider how much cooperation he gets." [Tr. 2 at 48]. During the knock-and-talk and subsequent meeting, TFO Orr stated that he made no promises of immunity or that Defendant's statements would not be used against him. [*Id.* at 15]. After state charges were brought against Defendant, Ms. Murrell

31

contacted SA Davis and told him that Defendant was interested in fully cooperating. [*Id.* at 104]. During the March 5, 2018 meeting, no prosecuting attorney, including an AUSA, was present [Tr. 1 at 71], and Detective McCarter and TFO Orr testified that they did not tell Defendant that his statements would not be used against him [*Id.*; Tr. 2 at 22]. Ultimately, TFO Orr stated that law enforcement discussed Defendant's cooperation and stated that they would present Defendant's level of cooperation to the "state ADA or the U.S. Attorney's Office . . . and let them decide on any kind of cooperation agreement." [Tr. 2 at 22]. Detective McCarter similarly testified that Defendant was told that the effect of his cooperation would depend on how much the AUSA was willing to credit his level of cooperation. [Tr. 1 at 71]. Although Ms. Murrell subsequently emailed Detective McCarter, including stating that Defendant was concerned about the possibility of new charges arising out of the discussions at meetings, *see* [Exh. 5], she later testified she had not told Defendant that he had immunity from federal prosecution, but that his cooperation would be taken into account in not bringing any more state charges. [Tr. 2 at 134].

During the March 8 meeting, Defendant asserts that he was induced to make incriminating statements due, in part, to the agents' statement that they "we're not looking to jam him up more." [*Id.* at 25]. However, Ms. Murrell subsequently testified that she was never promised that Defendant would not be charged federally. [*Id.* at 138]. SA Davis testified that it was discussed with Ms. Murrell that Defendant may get credit based on his level of cooperation, but the degree of leniency would be determined by the state or federal prosecutor. [*Id.* at 161]. Further, Detective McCarter and TFO Orr both testified that there were no promises made at this meeting that Defendant's statements would not be used against him. [Tr. 1 at 74; Tr. 2 at 25]. Detective McCarter also stated that there were no promises of immunity made to Defendant. [Tr. 1 at 74].

TFO Orr added that there was no authorization either from the USAO or the Blount County DA's office to negotiate any sort of plea [Tr. 2 at 35], as well as that he made no promise to Defendant that the case would not go federal. [*Id.* at 25]. Although Ms. Murrell was not present at the March 14 meeting where Defendant signed the CSA, the agreement specifically stated that Defendant did not have any immunity or protection from investigation or prosecution for any activities other than those authorized by the DEA. [Exh. 6].

Therefore, the Court finds that "no evidence was presented demonstrating the officers who spoke with [Defendant] were authorized to conduct plea negotiations or indicated to [Defendant] that they were authorized to negotiate a plea." *See United States v. Henderson*, No. 1:03-CR-155, 2005 WL 8159585, at *5 (E.D. Tenn. Apr. 26, 2005). The law enforcement officials who participated in the March 2018 debriefings consistently testified that from the beginning of discussing Defendant's cooperation, they stated that they had no authority to engage in plea negotiations, made no promises that federal charges would not be brought, and made no statements that Defendant was entitled to immunity due to his cooperation or that any statements would not be used against him. *See United States v. Salyers*, No. 06-CR-10059, 2009 WL 188784, at *2 (W.D. Tenn. Jan. 26, 2009) ("None of these named agents had authority to negotiate a plea agreement, which means that any statements made by the Defendant to them, regardless of the content, could not have been made 'in the course of plea discussions.'") (quoting *United States v. Marks*, 209 F.3d 577, 582 (6th Cir. 2000)).

In obtaining Defendant's cooperation with the federal investigation, law enforcement agents merely stated that they would present Defendant's level of cooperation to the prosecuting authorities in order for them to determine its effect. In *United States v. O'Neal*, the Sixth Circuit

33

held that when arresting officers told the defendant that they would write a letter on his behalf to the prosecutor, "it would not be objectively reasonable to believe that the police had been authorized to negotiate a plea on behalf of the prosecutor if they could not guarantee results." 992 F.2d 1218 (Table), 1993 WL 133807 at *8 (6th Cir. Apr. 28, 1993). Similarly, in *Henderson*, this District held that when "[a]t best, [the defendant] was told that law enforcement would 'go to bat' for him by talking to the prosecutors to see what could be done in light of [the defendant's] cooperation . . . this does not constitute plea discussions with the prosecuting authority." 2005 WL 8159585, at *5. While law enforcement officials had more extensive involvement with Defendant in the present case, they ultimately were involved in the continued investigation of the alleged drug conspiracy, rather than negotiating plea discussions in exchange for Defendant's involvement. While Ms. Murrell may have believed that federal charges would not be brought against Defendant due to his cooperation, TFO Orr and SA Davis merely stated that they would present Defendant's level of cooperation for consideration by the prosecuting authorities. *See, e.g.*, *United States v. Posey*, 611 F.2d 1389, 1390–91 (5th Cir. 1980) (holding "[law enforcement's] statement that he would bring Posey's cooperation to the attention of the prosecutor and the court did not give Posey a reasonable expectation that he was negotiating a bargain").

Defendant also claims that he and his counsel had a reasonable belief that the federal agents had the express authority to negotiate a plea deal, and "the proper test examines the totality of the circumstances informing the defendant's belief, not the objective express authority of the government negotiator." [Doc. 93 at 16 (citing *United States v. Harris*, 657 F. Supp. 2d 1267, 1274 (N.D. Fla. 2009)]; *see also* [Doc. 77 at 12]. In *Harris*, the defendant agreed to cooperate in an investigation of a drug trafficking organization after being told that he would not be federally

34

indicted or "have to do serious jail time if he cooperated." 657 F. Supp. 2d at 1269–70. However, also in *Harris*, the defendant "did not make any inculpatory statements until he had secured a specific bargain." *Id.* at 1273. "In contrast, here, there was no bargaining process, a mutuality of advantage, and a mutuality of disadvantage . . . there was no discussion of any plea or any bargain resulting therefrom." *United States v. Holzendorf*, No. 3:11-CR-81-J-34JBT, 2012 WL 3871860, at *13 (M.D. Fla. Jan. 18, 2012) (internal citation and quotation marks omitted) (discussing *Harris*), *report and recommendation adopted by*, 2012 WL 3871744 (M.D. Fla. Sept. 6, 2012).

Defendant and Ms. Murrell did not engage in any discussion regarding a potential plea with the federal agents, and the agents repeatedly testified that they did not make any promises regarding what Defendant would receive in exchange for his level of cooperation or that his statements would not be used against him. Ultimately, the agents' actions and communications with Defendant can be characterized as typical conduct involved in a continued law enforcement investigation, rather than a meeting with agents authorized to negotiate on behalf of a prosecutor or to determine if the Government was interested in starting plea negotiations. *Cf. United States v. Ross*, 588 F. Supp. 2d 777, 783 (E.D. Mich. 2008) (finding a meeting "in which the parties' interest in embarking on plea discussions is assessed" may constitute plea negotiations under Rule 410).

Accordingly, the Court finds that Defendant was not involved in plea negotiations while making the challenged statements during the March 2018 debriefs with law enforcement, as there was not an attorney for the prosecuting authority involved under Rule 410, the agents were not undergoing plea negotiations with Defendant, and they did not indicate to Defendant that they were authorized to initiate plea negotiations.

### 3. Voluntariness of Statements

Alternatively, Defendant asserts that his advice from counsel that his statements made at the debriefings would not be used against him, as well as assurances from law enforcement that they "weren't looking to jam him up more" were "sufficient to overbear his will" and render his statements involuntary. [Doc. 93 at 23–24]. The Government responds that any statements were voluntarily given under the advisement of counsel while Defendant was not in custody. [Doc. 96 at 6–7].

When determining if a defendant's statement is involuntary due to police coercion, the Sixth Circuit employs the following three-step analysis: whether (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). Further, coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *See United States v. Cody*, 498 F.3d 582, 588 (citing *Colorado v. Connelly*, 479 U.S. 157, 166 (1986)). Lastly, "the government bears the burden of proving by a preponderance of the evidence that the [statement] was in fact voluntary[ily made]." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003).

The Sixth Circuit has held that law enforcement's promises of leniency can be objectively coercive if those promises are broken or illusory. *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011); *United States v. Johnson*, 351 F.3d 254, 261–62 (6th Cir. 2003); *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). However, "promises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced." *Stokes*, 631 F.3d at 809 (citing *United States v.*

36

*Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005)).  "[A]n illusory promise is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action."  *United States v. Binford*, 818 F.3d 261, 272 (6th Cir. 2016) (quoting *Johnson*, 351 F.3d at 262 n.1); *see also United States v. Siler*, 526 F. App'x 573, 576 (6th Cir. 2013) (stating that a promise is also "problematic if a police officer leads a defendant to believe that he will receive lenient treatment when this is quite unlikely") (internal quotations and citations omitted).  Ultimately, "[a] promise of leniency in exchange for cooperation . . . usually [is] permissible."  *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011).

When discussing the March 5, 2018 debrief,[8] Ms. Murrell testified that she usually makes a blanket statement that anything the defendant provides in the meeting would not be used against him, but that it can be used to investigate further crimes, although she was unable to conclusively state whether she made such a disclaimer at that meeting.  [Tr. 2 at 111].  While Defendant claims the agents agreed to this blanket disclaimer [Doc. 93 at 24], Ms. Murrell's resulting testimony does not clearly bear this out [Tr. 2 at 111, 129], and the testimony of Detective McCarter and TFO Orr refutes such claim.  Detective McCarter testified that he did not tell Defendant that his statements would not be used against him, or make any promises of immunity [Tr. 1 at 71, 85], and TFO Orr testified that there was no discussion about whether any of Defendant's statements could be used against him [Tr. 2 at 22].  Ms. Murrell subsequently sent an email on March 6 to Detective

---

[8] While Ms. Murrell was asked about the first meeting on "March 3" with Defendant and the agents after having been retained [Tr. 2 at 110], the testimony at the hearing established that the first meeting occurred on March 5, 2018.

McCarter and SA Davis stating that Defendant was "highly concerned with the possibility of new charges arising out of any conduct discussed in the meetings," but that "[w]e have discussed that, and we are moving forward." [Exh. 5]. Therefore, while Defendant claims that he was advised that statements made during the debriefing would not be used against him, this understanding was not promised by law enforcement or discussed with any prosecuting authority (including the USAO).

However, Defendant also asserts that he expected that federal charges would not be brought because of the response during the March 8 debriefing that law enforcement was "not looking to jam him up more." [Doc. 93 at 24]; *see* [Tr. 2 at 125]. Ms. Murrell testified that when the debrief began to discuss moving drugs from California to Tennessee, she interrupted the debrief and said "we're getting into federal kind of issues . . . we just want to make sure that we've got it on the table that he's bringing up a lot of things that implicate him both . . . state and federally," and that "let's kind of make sure that we're not looking to jam him up." [*Id.*]. Ms. Murrell claimed that the agents responded that "we're not looking to jam him up more," and that "if he's truthful with us, then we're going to be okay." [*Id.*]. However, SA Davis testified that he interpreted this response to mean that Defendant would receive credit if he cooperates, "[b]ut that we don't know what level of credit that would be." [*Id.* at 163].

Defendant asserts that the statements were involuntary because they were provided "with the reasonable understanding and expectation that he would receive lenient treatment in exchange for his cooperation." [Doc. 77 at 7]. He claims that Ms. Murrell advised him that his statements would not be used against him, and law enforcement stated that they were not looking to "jam him up more" in response to his concerns about potential implications in federal charges. [Doc. 93 at

38

24]. Further, Defendant asserts that law enforcement lacked authority to bring charges or decline to bring charges, and federal drug charges were later brought against him. [*Id.*].

Ultimately, as the Court has already discussed, law enforcement did not claim that Defendant would not face federal charges or that he would receive a certain plea deal. "[P]romises to recommend leniency or speculation that cooperation will have a positive effect do not make subsequent statements involuntary." *United States v. Montgomery*, 491 F. App'x 683, 687 (6th Cir. 2012) (quoting *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011)). In contrast, in *United States v. Siler*, the Sixth Circuit found that an officer's "explicit statements [which] were legally inaccurate" that the defendant would not be charged with a crime if he provided information, after stating that he wrote arrest warrants indicating which cases the prosecutors would pursue, were objectively coercive. 526 F. App'x 573, 576 (6th Cir. 2013). Here, the agents merely stated that they would present Defendant's level of cooperation to the prosecuting authorities. *See, e.g.*, *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011) (rejecting the defendant's argument that "the promise to inform the prosecutor of cooperation is de facto fraud, essentially because the promise could be perceived by the defendant as a promise of leniency even though the officers knew the Government is in no way obligated to provide such leniency"). The agents' conduct did not commit "the police to undertake a specific course of action in return for [the defendant's] cooperation." *United States v. Flack*, No. 3:08-CR-108, 2009 WL 5031320, at *6 (E.D. Tenn. Dec. 11, 2009) (quoting *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003)).

However, at issue is the agents' response that they were not looking to "jam him up more." [Tr. 2 at 125]. Ms. Murrell and SA Davis testified that they attributed different meanings to this

39

statement, as SA Davis stated that Defendant would receive credit for his cooperation if he cooperated "[b]ut that we don't know what level of credit that would be." [Tr. 2 at 163]. The agents testified that at no point throughout the investigation did they agree that Defendant's statements would not be used against him. While Defendant asserts that Ms. Murrell claimed that his statements would not be used against him, at no point did she obtain confirmation of this alleged belief. The Court notes that in her March 6 email, Ms. Murrell did not obtain verification that Defendant's statements would not be used against him [Exh. 5], and does not have notes establishing that she made a similar blanket assertion. Ultimately, Ms. Murrell testified that SA Davis never told her "in those specific words" that federal charges would not be brought against Defendant. [Tr. 2 at 140]. Further, following the March 8 debrief, Defendant's signed CSA[9] indicates that he understood that he has no immunity or protection from prosecution for anything that he says or does, and that the DEA would consider a request to advise the appropriate prosecutor's office of the level of cooperation. [Exh. 6]. Therefore, the Court finds that Defendant's challenged statements to law enforcement were voluntarily provided.

### B. Suppression of Evidence

Defendant seeks to suppress and bar admission of the currency and other items seized from his residence, contending they were improperly obtained during a warrantless search. [Doc. 94]. First, Defendant maintains that that the initial search of his residence was not justified as a protective sweep [*Id.* at 7]; the unlawful search of the residence tainted the subsequent consent to search given by Defendant's fiancé, Ms. Norton, and her consent was otherwise involuntary [*Id.*

---

[9] As the Court has previously detailed, following the March 8 debrief, Ms. Murrell gave the federal agents the ability to communicate directly with Defendant regarding his cooperation. [Tr. 2 at 119].

at 11]; and Ms. Norton lacked the authority to consent to the search and seizure of the duffel bag. [*Id.* at 17].

The Government responds that the seizure of the duffel bag and other items of evidence was not in violation of the Fourth Amendment. [Doc. 95]. The Government insists that the initial search of Defendant's residence was a permissible protective sweep [*Id.* at 3]; Ms. Norton provided consent for the initial sweep of the premises [*Id.* at 4]; Ms. Norton's consent for the search of the residence was voluntary [*Id.* at 6]; and Ms. Norton had authority to consent to the search of the bedroom where the duffel bag was found under the bed [*Id.* at 9].

### 1. Initial Search/Protective Sweep

Defendant asserts that the initial search of his residence following the execution of the arrest warrant was not justified as a protective sweep. [Doc. 94 at 7]. Defendant claims that at the time the protective sweep was ordered, he was in custody outside of the house, law enforcement had made contact with Ms. Norton and her child, and "TFO Standefer articulated no facts that would give law enforcement a reasonable belief that there was another individual in the house who posed a threat to the law enforcement agents." [*Id.*].

The Government maintains that the initial search was a permissible protective sweep because it was reasonable for law enforcement to believe that a defendant alleged to be involved in a drug trafficking organization would be around other dangerous individuals with weapons, as well as that Defendant fled out of the backdoor of the residence "in an apparent attempt to flee the authorities" while the arrest warrant was being executed. [Doc. 95 at 3].

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory

41

visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "The Supreme Court has identified two types of warrantless protective sweeps of a residence that are constitutionally permissible immediately following an arrest." *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009).

The first type permits an officer to, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. This type of protective sweep does not require any probable cause or reasonable suspicion. *Id.*

The second type of protective sweep permits an officer to search beyond immediately adjoining areas, provided that the officer can show that he or she "possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* (internal citations and quotation marks omitted). Such a sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. Further, because it is not a full search, the sweep must "last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.

Here, the Government asserts that the protective sweep was justified by Defendant's alleged conduct and "his attempt to flee from authorities." [Doc. 95 at 4]. Therefore, the Government maintains that it was reasonable for the officers to believe that a dangerous individual was inside the house. TFO Standefer testified that upon knocking on the door of Defendant's residence, he heard commotion from the back, where he was told by SA Blanton that Defendant

came running out of the back door. [Tr. 1 at 9, 23–24]. However, TFO Standefer also stated that Defendant cooperated upon receiving verbal commands from law enforcement. [*Id.* at 38]. Ms. Norton testified that she was directed to go outside after law enforcement entered the residence, as they stated that they were conducting a safety sweep. [*Id.* at 46–47]. TFO Standefer testified that upon entering the residence, it was an "automatic reaction" to clear the property for safety purposes, including where individuals that could pose a threat to law enforcement could hide, such as under the bed. [*Id.* at 9, 27].

Initially, the Court finds that the search of the bedroom in the residence does not qualify under the first type of protective sweep detailed by the Supreme Court in *Maryland v. Buie,* 494 U.S. 325 (1990). As Defendant correctly states, at the time of the arrest, Defendant was in handcuffs and detained in the backyard of the residence, and Ms. Norton and her child were also directed outside. Therefore, the search of the bedroom did not constitute a protective sweep of a place "immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334.

Under the second category of protective sweeps, Defendant maintains that law enforcement failed to detail articulable facts that led to a reasonable belief that a dangerous individual was present at Defendant's residence. The Sixth Circuit has "decline[d] to adopt a bright-line rule that prohibits police officers from conducting a protective sweep of a home every time they arrest a defendant outside that home, regardless of the potential danger from persons inside." *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996).

However, "officers may not justify a protective sweep solely on the ground that the arrested individual was suspected of drug dealing." *Perkins v. United States*, 127 F. App'x 830, 835 (6th

Cir. 2005) (citing *United States v. Hatcher*, 680 F.2d 438, 442 (6th Cir. 1982)). Additionally, "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996). In *Colbert*, the Sixth Circuit held that a protective sweep was not proper where the Defendant was in custody outside of his girlfriend's apartment, law enforcement had no reason to believe that other individuals were inside of the apartment and posed a danger to law enforcement, and the only justification claimed by the officers was that the girlfriend ran outside in a "hostile rage." *Id.* at 776.

Similarly, at the time of the protective sweep, Defendant was in custody outside of the residence posing no threat to the arresting officers. TFO Standefer did not assert that law enforcement had a reasonable belief that anyone else was present at the residence who might pose a danger to them, and by all accounts, Ms. Norton was cooperative with law enforcement. Moreover, TFO Standefer did not relate that there was any particular risk associated with Defendant's alleged involvement in the drug conspiracy. *Cf. Perkins*, 127 F. App'x at 835 ("In contrast to *Hatcher*, the officers here had more than a generalized suspicion of the risks associated with narcotics investigations; they had a legitimate reason for believing another individual (and an armed individual at that) was in the house-which, since *Buie*, has always been a sufficient reason for a protective sweep."). Rather, TFO Standefer testified that the decision to perform a sweep was an "automatic reaction" and that "[t]raining kicked in." [Tr. 1 at 25-26]. However, "[t]he police cannot justify a sweep simply by citing their standard procedure." *United States v. Taylor*, 666 F.3d 406, 409 (6th Cir. 2012) (citing *United States v. Williams*, 577 F.3d 878, 881 n.3 (8th Cir. 2009)).

44

On the facts of this case, the protective sweep was not justified on the basis of a need for protection of the arresting officers. Accordingly, the Court finds that the Government has not shown "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).

## 2. Consent to Protective Sweep

The Government, however, asserts that Ms. Norton provided consent to TFO Standefer to perform the initial sweep of the premises. [Doc. 95 at 4]. Defendant maintains that Ms. Norton's statement allegedly providing consent did not provide voluntary consent, nor did it provide "consent to search every nook and cranny of the house." [Doc. 97 at 4].

"The Fourth Amendment permits a search without a warrant if valid consent to search is given." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). At issue is whether Ms. Norton's consent to perform an initial sweep to look for other individuals within the residence was given voluntarily. Ms. Norton testified that as the officers entered the residence, she was in her daughters' bedroom, and as she was trying to grab her daughter, an officer pointed a gun at her and told her to go outside because they were conducting a safety sweep to look for other individuals in the home. [Tr. 1 at 46–47]. TFO Standefer testified that when he asked Ms. Norton if there was anyone else inside, she replied, "No, you're more than welcome to take a look." [*Id.* at 9, 25]. While clearing the bedroom, TFO Standefer noticed a duffel bag under the bed, where the flap of the bag was covered but not zipped, and he saw money in the bag. [*Id.* at 27–28]. However, TFO Standefer testified that he left the bag and continued clearing the residence to make sure no other individuals were present. [*Id.* at

45

29].

Defendant asserts that Ms. Norton's consent was not freely and voluntarily given, as she had just witnessed Defendant's arrest, she had a gun pointed at her when TFO Standefer asked if others were in the residence, "[h]er alleged consent was in response to the officer's suggestion that someone else might be in the house, and law enforcement did not inform Ms. Norton that she had a right to refuse to consent." [Doc. 94 at 17]. The Government claims that "Ms. Norton's statement that 'you're more than welcome to take a look' was an unequivocal statement of free and voluntary consent and not a response to show futility and resistance to the officers." [Doc. 95 at 5].

Defendant relies on *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999) in support of his argument that Ms. Norton's statement to officers that they were "welcome to take a look" did not constitute unequivocal and voluntary consent. In *Worley*, a plain-clothes officer approached the defendant in the airport as the defendant was placing his bags in an airport locker, and asked if he could look inside the bag. *Id.* at 382–83. The defendant responded, "You've got the badge, I guess you can," and the subsequent search found methamphetamine inside of the bag. *Id.* at 383. "In assessing whether Worley consented to the search, the Sixth Circuit acknowledged the absence of overt duress or coercion—there was no lengthy detention, no weapons were drawn, and the parties spoke in calm, conversational tones." *United States v. Silas*, No. 1:16-CR-124, 2017 WL 6544197, at *8–9 (E.D. Tenn. Dec. 18, 2017) (citing *Worley*, 193 F.3d at 386). The Sixth Circuit, however, found the defendant's statement was not an "unequivocal statement of free and voluntary consent," but rather "an expression of futility in a resistance to authority or acquiescing the officers' request." *Worley*, 193 F.3d at 386.

46

The Government cites to *United States v. Walls*, 116 F. App'x 713, 717 (6th Cir. 2004), where the Sixth Circuit held that the defendant's statement of "go ahead" to allow a search of his home was not "mere acquiescence" to law enforcement's claim of lawful authority to search, so as to preclude a finding that the defendant freely and voluntarily consented to a search. [Doc. 95 at 6]. In *Walls,* the officer asked the defendant whether he "had anything in the house that he shouldn't have," shortly after effectuating the defendant's arrest on the front porch. 116 F. App'x at 715. When the defendant responded, "no," the officer then asked, "do you mind if I take a look." *Id.* The defendant's statement of "go ahead" was noted to be almost exactly the same response as in *Schneckloth v. Bustamonte,* 412 U.S. 218, 220 (1973), where "[s]ure, go ahead" was found to be a valid expression of consent. *Walls*, 116 F. App'x at 717.

Here, the Court finds that Ms. Norton did not merely acquiesce to the officer's demands to perform a protective sweep. Similar to *Walls*, her response of "[y]ou're more than welcome to take a look" to TFO Standefer's question clearly provided her consent to search the residence to see if any other individuals were present. [Tr. 1 at 9]. "[T]here are no magic words required for valid consent. Consent to a search 'may be in the form of words, gesture, or conduct.'" *United States v. Murphy*, No. 1:11-CR-75, 2012 WL 1247999, at *7 (E.D. Tenn. Jan. 10, 2012) (citing *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004)), *report and recommendation adopted by*, 2012 WL 1248241 (E.D. Tenn. Apr. 13, 2012).

Defendant further cites to *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999) to claim that "tremendous pressure" was placed on Ms. Norton to acquiesce to the officer's demands, as well as that "Ms. Norton had just witnessed [Defendant's] arrest in the backyard and had a gun pointed at her when TFO Standefer asked her if others were in the residence." [Doc. 94 at 17]. As

47

an initial matter, the Court notes that Ms. Norton's testimony does not clearly establish that a gun was pointed at her when TFO Standefer asked her if others were in the residence. Ms. Norton testified that the only time that law enforcement pointed a gun at her was when they first entered the residence. [Tr. 1 at 53]. She stated, "I cannot remember his face, but I remember just seeing a gun pointed at me, and … I immediately just went into panic mode," and the officers then told her to go outside and that they were doing a safety sweep of the house. [*Id.* at 46–47]. TFO Standefer testified that when he saw Ms. Norton "right inside of the doorway," he asked her to grab her child and come outside. [*Id.* at 9]. He stated that he then asked her if anyone else was inside, and she responded "No, you're more than welcome to take a look." [*Id.*]. In *United States v. Scott*, the Sixth Circuit found that a consent to search was given voluntary as "[t]he entry was peaceable," and "[a]t most, one officer may have had a gun drawn; this, however was a reasonable precaution, not a coercive gesture." 578 F.2d 1186, 1189 (6th Cir. 1978) (holding an apartment lessee, who told officers they could look for the defendant inside, voluntarily consented to the initial search of her apartment). Moreover, it appears that TFO Standefer's gun was not drawn when Ms. Norton gave her consent to search the residence to see if any other individuals were inside.

Further, *Worley* addressed the coercion related to the unique "location and conditions" of consenting to a search at a public airport. 193 F.3d at 387. Here, while Ms. Norton claimed to be frightened by law enforcement pointing a gun at her, she was also in an inherently less coercive environment at her private residence. *See, e.g.*, *United States v. Ables*, 280 F. App'x 513, 517 (6th Cir. 2008) (noting "the officers confronted [the defendant's girlfriend] in a private residence as opposed to an airport at issue in Worley where 'it [is] easy for implicit threats or subtle coercion

48

to exert tremendous pressure on an individual to acquiesce to the officer's wishes'") (citing *Worley*, 193 F.3d at 387).

Additionally, the Court notes that there is nothing about Ms. Norton to suggest that she was incapable of consent or particularly susceptible to the officers' requests. Ms. Norton is an adult, and no evidence was presented that would suggest that she suffered from any mental disability. Further, although Ms. Norton had not been told that she could refuse to consent to a search, "this fact alone does not automatically render a consent-based search involuntary." *United States v. Silas*, No. 1:16-CR-124, 2017 WL 6544197, at *8–9 (E.D. Tenn. Dec. 18, 2017) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

Lastly, Defendant alleges that even if Ms. Norton voluntarily consented to the sweep, "any consent given by Ms. Norton was clearly limited to allowing a sweep of the house to determine whether other individuals were inside." [Doc. 97 at 5]. Under *Maryland v. Buie*, a protective sweep is limited to "a cursory inspection of those spaces where a person may be found and should last no longer than necessary to dispel the reasonable suspicion of danger." 494 U.S. 325, 335–36 (1990). In conducting the protective sweep, TFO Standefer looked under the bed, saw that there was money within the bag, moved the bag, and "once [he] knew there was no one under the bed, [h]e moved on." [Tr. 1 at 29]. Looking under the bed was a reasonable location to see if individuals were inside of the bedroom, and TFO Standefer did not search the duffel bag. *See United States v. Meredith*, 107 F.3d 872 (6th Cir. 1997) ("Officer Meeks limited his search to places where persons could be hiding such as under beds and in closets; the protective sweep was, therefore, properly limited.").

49

Ultimately, "[a] consensual search is normally limited by the scope of the consent that supports it." *United States v. Elkins*, 300 F.3d 638, 648 (6th Cir. 2002) (internal citation omitted); *see, e.g.*, *Florida v. Jimeno*, 500 U.S. 248, 252 (1991) ("The scope of a search is generally defined by its expressed object."); *Hall v. Sweet*, 666 F. App'x 469, 475 (6th Cir. 2016) (noting "[t]he scope of consent is determined by objective reasonableness") (citing *United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004)). Accordingly, the Court finds that Ms. Norton voluntarily provided her consent for law enforcement to perform a search to see if any other individuals were present in the house.

### 3. Consent to Search of House

Defendant challenges Ms. Norton's alleged consent to search the house following the initial protective sweep, claiming that her consent was not voluntary, as well as that she lacked the authority to consent to the search and seizure of the duffel bag found under Defendant's side of the bed.

### a. Voluntariness of Consent

Defendant asserts that Ms. Norton's consent to search the house following the protective sweep was tainted by the alleged, initial, unlawful search, and her subsequent consent "was not sufficiently voluntary to purge the taint of that search." [Doc. 94 at 13]. Defendant claims that Ms. Norton's consent was not voluntary because law enforcement had pointed a gun at her upon entering the residence, handcuffed Defendant and placed him in the back of a patrol car, a protective sweep was performed, law enforcement confronted her about the bag of money found under the bed, and obtained her consent "all within ten minutes." [Tr. 1 at 33]. Additionally, Ms. Norton testified that she "was so scared, I was going to sign anything," as well as that she was told

50

that if she did not consent, then the officers would obtain a search warrant. [*Id.* at 48].

The Government responds that Ms. Norton's consent was voluntarily given because TFO Standefer testified that none of the agents threatened Ms. Norton in any way while she was signing the consent form [*Id.* at 12], SA Blanton explained to Ms. Norton that she could stop the search at any time and did not have to give consent [*Id.* at 10], and Ms. Norton's demeanor was recalled to be "nice throughout the whole process" [*Id.* at 32] of obtaining her consent. [Doc. 95 at 7]. Lastly, the Government points to Ms. Norton's signed Consent to Search Form [Exh. 1] stating that she had "not been threatened, nor forced in any way" to consent to the search of her residence. [Doc. 95 at 7].

Ms. Norton testified that law enforcement told her that "they found a bag of money under the bed and they wanted to go ahead and get my consent to search the house." [Tr. 1 at 48]. She further stated that at this point, she signed the consent form "[a]nd I was so scared, I was going to sign anything." [*Id.*]. However, TFO Standefer testified that he did not have any discussion with Ms. Norton about the duffel bag which he saw while performing the protective sweep prior to obtaining her consent. [*Id.* at 29].

Ultimately, the Court finds that Ms. Norton's consent was voluntarily given to search the residence following the protective sweep. While Ms. Norton testified that she was scared to the point that she was unable to comprehend what she was signing [*Id.* at 33], TFO Standefer testified that at this time, law enforcement and Ms. Norton had moved inside of the house to attempt to deescalate the situation and make the environment more "comfortable" for the child. [*Id.* at 9]. The officers' guns were holstered at this point, and Ms. Norton stated that she did not feel that the officers "were going to shoot [her]" if she did not provide consent. [*Id.* at 58]. Further, although

51

she testified that she was scared, Ms. Norton also stated that she "was really calm" while having discussions about her consent to search. [*Id.* at 53-54]. TFO Standefer further testified that the officers did not threaten Ms. Norton during this period, and that she was collected throughout the conversation, to where the presence of police officers "didn't seem to bother her." [*Id.* at 32].

Defendant alleges that law enforcement asking for Ms. Norton's consent to search the residence after already conducting a protective sweep gave rise to the reasonable belief that refusing to consent at that point "would be a bit like closing the barn door after the horse is out." *United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002). The Court has already found, however, that Ms. Norton provided her consent for law enforcement to search the house to determine if anyone else was inside the residence. [10] In *Haynes*, the Sixth Circuit recognized that an individual's "knowledge of a prior illegal search can also give rise to a sense of futility," thus requiring the Court to determine whether a subsequent consent to search was sufficiently removed from the taint of the original illegal search. *Id.* However, in the present case, Ms. Norton consented to the prior protective sweep, rendering it a valid search, and therefore she had no "knowledge of a prior illegal search" that could give rise to such a sense of futility. *Id.*

Further, TFO Standefer's discovery of the duffel bag during the protective sweep did not lead to a sense of futility where Ms. Norton would have felt obligated to consent to the search. First, although cash in the duffel bag was visible, TFO Standefer testified that he merely moved the bag over and continued on with the protective sweep. [Tr. 1 at 28]. While Ms. Norton claims

---

[10] As the Court has found that the initial protective sweep was a permissible search, the Court is not required to examine whether Ms. Norton's subsequent consent to search the house was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *United States v. Hayes*, 301 F.3d 669, 682 (6th Cir. 2002).

52

that she was aware they had found the duffel bag prior to signing the consent form, TFO Standefer testified that he did not have any discussions with Ms. Norton about the bag prior to obtaining her consent. [Doc. 95 at 8; *see* Tr. 1 at 29]. Additionally, and in any event, TFO Standefer testified that SA Blanton reviewed the consent form with Ms. Norton, while explaining that she could stop them at any time and was not required to provide consent. [Tr. 1 at 10, 49].

Defendant also cites to *United States v. Tatman*, 397 F. App'x 152 (6th Cir. 2010) to claim that Ms. Norton's "hastily scribbled initials on the consent to search form are not dispositive of the voluntariness of her alleged consent." [Doc. 94 at 15]. In *Tatman*, the Sixth Circuit held that the consent of the defendant's wife to search the residence was involuntary, as although the consent form included a clause that she had the right to refuse consent to search, the defendant's wife "signed the consent form in the middle of the night, after the domestic dispute with [the defendant], and just after [he] was taken in handcuffs into the back of a police cruiser." 397 F. App'x at 165. Therefore, the Sixth Circuit found that "it seems quite likely that [the defendant's wife] did not even read this statement contained in the consent form, let alone intelligently consider its meaning." *Id.*

In the present case, however, Ms. Norton's conversation with law enforcement, as well as Defendant's arrest, did not take place in the middle of the night, or following the chaotic and hectic event of police responding to a domestic disturbance. Ms. Norton was described to be cooperative with law enforcement, and extremely nice throughout the entire process. Ms. Norton herself testified that she was "really calm" [Tr. 1 at 53] and that overall, the agents were nice and polite to her [*Id*. at 55]. Lastly, although only around ten minutes had passed from when the officers arrested Defendant in the backyard to when Ms. Norton executed the consent to search form, law

enforcement took several steps to deescalate the situation—including holstering their weapons, some officers removing their tactical gear, going back into the house, and reviewing the consent to search form with Ms. Norton on the couch. Further, although Ms. Norton testified that she was told that if she did not consent, law enforcement would consequently obtain a search warrant, "[i]t is well-settled that the agent's statements to the effect that he would obtain a warrant if [the defendant] did not consent to the search does not taint [the subsequent] consent to a search." *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998). Accordingly, the Court finds that Ms. Norton voluntarily gave consent for law enforcement to search the residence, and this consent was not obtained through duress or coercion.

### b.      Authority to Consent

Defendant maintains that Ms. Norton lacked the authority to consent to the search and seizure of the duffel bag. [Doc. 94 at 17]. The Government responds that Ms. Norton had authority to consent to the search of the bedroom where the duffel bag was found under the bed. [Doc. 95 at 9].

"[W]hen the government seeks to justify a warrantless search by proof of voluntary consent, in the absence of proof that consent was given by the defendant, it 'may show that permission to search was obtained from a third party who possessed common authority or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005) (quoting *United States v. Matlock*, 415 U.S. 164, 171–72 (1974)). "[C]ommon authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right and that the others have assumed the

54

risk that one of their number might permit the common area to be searched.'" *Id.* (quoting *Matlock*, 415 U.S. at 171, n.7). "On this basis, a resident's consent to search his home is not necessarily consent to search a closed object within the home." *Id.*

Similarly, the government can justify a warrantless search based on the consent of a third-party, "where the officers conducting the search 'reasonably (though erroneously) believe that the person who has consented' to the search had the authority to do so." *United States v. Taylor*, 600 F.3d 678, 681 (6th Cir. 2010) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)). "The government bears the burden of establishing the effectiveness of a third party's consent." *Id.*

Defendant asserts that Ms. Norton "lacked the authority to consent to the search and seizure of the duffel bag found under [Defendant's] side of the bed." [Doc. 94 at 17]. However, the Sixth Circuit has "confirmed a number of times that a live-in girlfriend has common authority over the premises wherein she cohabits with a boyfriend." *United States v. Penney*, 576 F .3d 297, 308 (6th Cir. 2009). In *United States v. Moore*, 917 F.2d 215 (6th Cir.1990), for example, the Sixth Circuit held that the defendant's girlfriend, who shared a bedroom with the defendant, was a joint occupant of the residence and had common authority to consent to a search of the residence. *Id.* at 223. Here, Ms. Norton was Defendant's fiancé, and lived in the residence with him and her child. Defendant fails to point to any case law supporting his argument that the fact that the duffel bag was found under his side of the bed establishes that Ms. Norton did not have common authority over the duffel bag. Rather, Ms. Norton had "joint access" and "control" over the items in her bedroom, and Defendant therefore "assumed the risk" that she would allow this area to be searched. *Matlock*, 415 U.S. at 171 n.7.

55

Defendant claims that the officers knew that Ms. Norton did not have authority to consent to the seizure of the duffel bag, as "[t]he officers' questioning of Ms. Norton regarding [Defendant's] employment and whether the money in the bag belonged to Defendant reflects that they already knew the bag belonged to him and not Ms. Norton." [Doc. 94 at 18]. However, Ms. Norton testified that after the search, "they brought out a bag of money and they had me sign the bag," and she stated that she was uncomfortable because she had never seen the bag before. [Tr. 1 at 49]. While she claimed that the officers told her about finding a bag of money following the protective sweep, before obtaining her consent to search the premises [Tr. 1 at 48], TFO Standefer testified that Ms. Norton stated that she did not own the duffel bag after the subsequent search [*Id.* at 15], and that he did not recall any discussion with Ms. Norton about the duffel bag before seeking her consent to search [*Id.* at 29].

Defendant cites to *United States v. Waller*, 426 F.3d 838 (6th Cir. 2005), where the Sixth Circuit held that the defendant had a reasonable expectation of privacy in a zipped, closed suitcase stored in a bedroom closet at a friend's apartment, and that the friend did not have the authority to consent to a search of the defendant's luggage. *Id.* at 845–46. However, in the present case, Defendant's fiancé consented to a search of their shared bedroom, and she had joint access to the bag under her bed.

"A valid consent to search [a] closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes." *Id.* at 845. Here, TFO Standefer testified that he was able to see the cash inside of the duffel bag while moving it to search under the bed during the protective sweep, and that upon searching it, the bag was "not zipped but shut."

56

[Tr. 1 at 28]; *see* [Exh. 2]. Ms. Norton had access to the bedroom and Defendant did not seal or lock the duffel bag; rather, he left it under the bed in the bedroom that he shared with Ms. Norton. Defendant therefore failed to take actions to manifest an expectation of privacy or signify that Ms. Norton did not have access to the duffel bag. Ultimately, Ms. Norton had common authority over the duffel bag, as it would be "reasonable to recognize" that she, as a co-inhabitant, had "the right to permit the inspection in [her] own right" and that Defendant assumed the risk that she would permit the duffel bag to be searched. *Matlock*, 415 U.S. at 171 n.7.

Therefore, the Court finds that Ms. Norton had actual authority to consent to a search of the duffel bag at issue, which was located under the bed in the bedroom that she shared with Defendant. *See, e.g.*, *United States v. Hylton*, 349 F.3d 781, 785–86 (4th Cir. 2003) ("Hylton and Harper [the defendant's girlfriend] co-inhabited the apartment that Harper leased. When Hylton stayed in the apartment, he shared the bedroom and bed with Harper. Accordingly, there can be no doubt that Harper had authority to consent to a search of both the apartment and the bedroom in which she slept. This factual circumstance is to be distinguished from a situation where one co-habitant has an exclusive and private area within the jointly occupied premises justifying the exclusion of others, such as a locked foot locker.") (internal citation omitted); *United States v. Castaneda-Abrego*, No. 3:06-CR-378-W, 2007 WL 87666, at *6 (W.D.N.C. Jan. 9, 2007) (finding third-party consent to search valid where it was given by defendant's live-in girlfriend who had "a plenary right of access to the bedroom and had ready access (even if not theretofore exercised) to the contents of the suitcase; and [where] the Defendant took no special precautions to protect his expectation of privacy in the contents of the suitcase, and in fact the suitcase was lying (albeit zippered shut) unlocked, in plain view on the floor in the middle of the bedroom"); *United States*

57

*v. Long*, No. 04-159, 2005 WL 2807123 at *6 (W.D. Pa. Oct. 27, 2005) (finding wife had authority to consent to search of husband's duffel bag in a closet as "[t]he bag was located in the master bedroom of the house Defendant's wife occupied").

Moreover, even if Ms. Norton did not have common authority over the duffel bag at issue, the officers reasonably relied upon her apparent authority to consent to the search. As the Court has already detailed, Ms. Norton's testimony does not establish that she informed law enforcement prior to the search that she had never seen the duffel bag, and TFO Standefer testified that he did not discuss the bag with Ms. Norton prior to the search. Law enforcement was aware that Ms. Norton and her child lived at the house with Defendant. *See, e.g.*, *United States v. Sosa*, No. CRIM.A. 05-44-1, 2005 WL 3303869, at *5 (E.D. Pa. Dec. 2, 2005) ("Additionally, because the duffel bag was left in the room that was apparently Mr. Quinonez's bedroom, the agents' belief that Mr. Quinonez had authority to consent to the search of the bag also was reasonable."). Further, "[t]he officers had no reason to believe that the bag belonged to [Defendant] before opening it." *See, e.g.*, *United States v. Anthony*, No. 3:10-CR-013-K, 2010 WL 4274751, at *4 (N.D. Tex. Oct. 21, 2010) ("Here, Engel [the defendant's girlfriend] did not instruct the officers to limit their search to certain areas or items in the hotel room, nor did she identify any objects that did not belong to her. There were no identifying marks or tags on the blue duffle bag."), *aff'd*, 487 F. App'x 921 (5th Cir. 2012). Law enforcement was not presented with an ambiguous situation requiring them to further inquire about the ownership of the duffel bag because Ms. Norton was Defendant's fiancé who resided at the home. *See United States v. Grayer*, 232 F. App'x 446, 449 (6th Cir. 2007).

Accordingly, the Court finds that Ms. Norton had both the actual and apparent authority to consent to a search of the residence, including the duffel bag at issue, and Defendant's arguments do not present a basis to suppress the evidence.

## IV. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that Defendant's statements made to law enforcement should not be suppressed pursuant to Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f). Further, the Court finds no Fourth Amendment violation occurred in this case because Ms. Norton provided valid consent to look for other individuals in the house, as well as search the residence and duffel bag at issue. Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress Evidence [**Doc. 46**] and Motion to Suppress Statements [**Doc. 64**], as amended [**Doc. 77**] be **DENIED**.[11]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[11] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).