# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | CASE NO. 3:18-CR-157-PLR-DCP-3 |
| JOSEPH STANTON, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

The Honorable Debra C. Poplin, United States Magistrate Judge, filed a 59-page Report and Recommendation [R. 108], in which she recommended that Defendant's Motion to Suppress Evidence [R. 46] and Motion to Suppress Statements [R. 64], as amended [Doc. 77] be denied.

This matter is before the Court for consideration of Defendant's objections [R. 109] to the Report and Recommendation. As required by 28 U.S.C. § 36(b)(1) and Fed. R. Civ. P., 72(b), the Court has now undertaken a *de novo* review of those portions of the Report and Recommendation to which Defendant objects. For the reasons that follow, the Court finds Defendant's objections without merit and the objections will be overruled.

The parties do not object to Judge Poplin's factual determinations, and the court concludes they are accurate. Judge Poplin's factual findings are as follows:[1] Beginning on October 31, 2017, Defendant Joseph Stanton was contacted by federal law enforcement regarding their investigation of an alleged marijuana distribution operation. Defendant subsequently cooperated in the federal investigation, during the course of which he made certain statements to law enforcement officials. Although Defendant had several interactions with investigators, the only relevant meetings at issue

---

[1] Given the fact-intensive nature of this case, this Court has included a more detailed factual determination and description of the allegations when addressing the specific objections below.

pertain to statements he made during meetings on March 5 and March 8, 2018. Defendant seeks to suppress certain statements he made to law enforcement officials during those meetings.

In February 2018, Defendant was arrested on state charges of possession of marijuana with intent to resell. On October 2, 2018, a federal grand jury returned an indictment charging Defendant with one count of conspiracy to distribute 1000 kilograms of marijuana and one count of conspiracy to commit money laundering. During Defendant's arrest at his residence on these federal charges, law enforcement conducted a search of the house and seized a duffel bag of U.S. currency and other items of evidence. Defendant also seeks to suppress and bar admission of the currency and other items seized.

Defendant filed six objections to the R&R. The first three objections all pertain to the suppression of statements made by Defendant in the two meetings in March of 2018. The relevant facts pertaining to those three objections are as follows: In late 2017, Defendant had several interactions with investigating officers and discussed cooperating with them and performing controlled buys. Defendant did not successfully cooperate at that time. In February of 2018, after Defendant was arrested on the state possession charges, he hired Brandi Murrell as his legal counsel. Ms. Murrell reached out to Mike Davis, a special agent with the DEA ("SA Davis"), and he informed her that Blount County Assistant District Attorney Ryan Desmond ("ADA Desmond") would be the prosecutor for the state drug charges. During her phone call with SA Davis, Ms. Murrell told SA Davis that Defendant wanted to begin fully cooperating, and she later testified that SA Davis indicated that the DEA was still interested in his cooperation.

Ms. Murrell testified that "[t]he biggest issue was that [Defendant]…was on unsupervised probation at the time out of Sevier County." SA Davis talked to Defendant's probation supervisor and asked that his probation not be revoked so that he could cooperate. Ms. Murrell further testified

that she and ADA Desmond discussed Defendant "being debriefed and being a source, and that he would listen and do what the DEA wanted." Ms. Murrell confirmed that she was never granted any sort of immunity for Defendant in the state prosecution.

ADA Desmond related his recollection of discussions with Ms. Murrell, stating that he was aware that the federal authorities were interested in talking to Defendant, as well as multiple other individuals who were involved in the investigation. While not ever reaching a formal offer, ADA Desmond suggested to Ms. Murrell that he would ultimately dismiss the state charges if Defendant was fully cooperative. ADA Desmond made no promises of immunity to Ms. Murrell and stated that he had no discussion with her about whether any statement that Defendant made to anyone would be used against him. He further stated, "[n]o one in my office, that I know of, was present or would have signed any sort of statement saying anything he used in that debrief could not be held against him. I'm not aware of anything like that. It would have been me who it would have gone through." ADA Desmond further confirmed that he was never involved with any discussion with an AUSA regarding whether he could negotiate plea discussions and never promised Defendant that he would not be charged federally.

Subsequently, Ms. Murrell called SA Davis, and advised him that she was representing Defendant and that they wanted to come in and talk. SA Davis testified that there were no discussions between he and Ms. Murrell about the parameters of the meeting; whether or not the meeting would be a proffer session; or whether or not any statements Defendant made during this initial meeting would be used against him. He further testified that he did not promise any form of immunity. The meeting occurred on March 5, 2018, and included Detective McCarter, Task Force Officer ("TFO") Orr, SA Davis, Defendant, Attorney Marcos Garza, and Ms. Murrell. Detective McCarter testified that SA Davis was involved in the meeting as to his investigation of Defendant's

involvement with David Wells, a co-defendant in the instant case who is also accused of distributing marijuana. No one from the Blount County prosecutor's office or the United States Attorney's Office ("USAO") was present at the meeting.

Ms. Murrell testified that generally at the beginning of such meetings, which she referred to as debriefs, she makes a blanket disclaimer that the information the defendant gives in the meeting is not going to be used against him but can be used to investigate further crimes. With respect to the March 5 meeting, however, Ms. Murrell stated she could not definitively say whether her notes from the meeting reflected that she made such disclaimer because she was no longer employed by the Garza Law Firm, and no longer had access to those notes. Detective McCarter testified that he did not tell Defendant that his statements would not be used against him or make any promises of immunity. He further testified that ADA Desmond had not authorized him to engage in any sort of plea negotiation.

TFO Orr similarly testified that there was no discussion about whether any of Defendant's statements would be used against him. He added that neither he nor anyone else in that meeting was asked by Defendant's attorneys whether Defendant's statements would be used against him. He further confirmed that he was not authorized by Blount County or anybody from the U.S. government to negotiate any sort of plea.

During the meeting, Defendant was asked to cooperate. Detective McCarter testified that in terms of the discussion with Defendant concerning the Blount County charges, McCarter told Defendant that "if he's cooperative and honest, then I would go -- go to bat for him with the district attorney," but "it just depends on -- on what the district attorney wants to do." Detective McCarter testified that Defendant was similarly told that how much his cooperation may help him would depend on what Defendant could do and what the AUSA was willing to give him for consideration.

4

At the end of the meeting, Ms. Murrell said that she would talk to Defendant further and get back in touch.

On March 6, 2018, Ms. Murrell sent an email to Detective McCarter. She explained that "[Defendant] has been highly concerned with the possibility of new charges arising out of any conduct discussed in the meetings. We have discussed that, and we are moving forward." At the hearing, Ms. Murrell testified that Defendant was concerned that information divulged in the meetings would be used against him. When asked why Defendant would be concerned about statements being used against him if she had already made clear at the first meeting that they would not, Ms. Murrell answered that it was because the discussions were getting into new information that involved cross-state transactions.

A second meeting with Defendant occurred shortly thereafter on March 8, 2018. In attendance were Detective McCarter, TFO Orr, SA Davis, Defendant, and Ms. Murrell. There were no prosecutors from Blount County or an AUSA in attendance. At the meeting, Defendant went into much greater detail about Wells' drug activity and his involvement in that activity with cross-state transactions of California to Tennessee, including dates, amounts, method of transportation, sources, and locations. He also identified several co-conspirators. Ms. Murrell testified that she interrupted the debrief and said, "hey, we're getting into multistate issues, you know, we're getting into federal kind of issues. And we just want to make sure that we've got it on the table that he's bringing up a lot of things that implicate him both, you know, state and federally. And let's kind of make sure that we're not looking to jam him up."

She stated that the response was something along the lines of, "we're not looking to jam him up more. If he's truthful with us, then we're going to be okay." Ms. Murrell testified that she took this statement as an expression of good faith that they were not looking to charge Defendant

5

federally, but that she was never promised "in those exact words." She further stated that SA Davis never told her "in those specific words" that no federal charges would be brought against Defendant.

SA Davis testified that "the terminology in terms of we wouldn't jam him up would reflect that he's going to get credit if he cooperates . . . [b]ut we don't know what level of credit that would be." He further testified that he never promised Defendant that he would not be charged federally if he cooperated; never promised Defendant or his attorney that his statement would not be used against him if he cooperated; and never made any promises of immunity from prosecution regarding Defendant. SA Davis stated that what they discussed with Ms. Murrell is that Defendant may get credit based on his level of cooperation, explaining that based on their cooperation, they advise the prosecutor, whether it be state or federal, who then determines the degree of leniency that they may get.

While Ms. Murrell stated that she did not have any expectation that what Defendant was telling the agents could later be used against him in a subsequent court proceeding, SA Davis did not recall her giving any such indication during the meeting. Both Detective McCarter and TFO Orr testified that there were no promises made at the meeting that Defendant's statements would not be used against him. Detective McCarter also stated that there were no promises of immunity made to Defendant. TFO Orr added that there was no authorization either from the USAO or Blount County DA's office to negotiate any sort of plea. He explained that he had not talked to anyone at the USAO at that point because it was early in the investigation.

He noted, however, that he made no promise to Defendant that he would not take the investigation federal. TFO Orr testified, "[t]here was never a promise made to anybody about whether or not this investigation -- because that was our goal to go federal, if we got the

6

cooperation and the historical information that we were looking for to go [federal] with the case." When Ms. Murrell was asked whether she told Defendant that he had immunity from federal prosecution, she replied, "[n]o, not in those words specifically." She stated that she discussed with Defendant and the agents that his cooperation would be considered in the state case and in not bringing further charges. Ms. Murrell acknowledged that she did not participate in any federal plea negotiations for Defendant.

Ms. Murrell testified that the agents did not ask for another debrief, and that she gave them the ability to communicate directly with Defendant about cooperating and "things like making buys, setting up . . . phone calls, making buys, those kind of things, not things that would implicate Defendant, but things that would implicate David Wells." She was aware that Defendant became a documented confidential informant with the DEA, but she did not go with him to sign the paperwork. Defendant signed the Confidential Source Agreement ("CSA") on March 14, 2018. Detective McCarter, TFO Orr, and SA Davis were present. SA Davis went over the CSA with Defendant line by line. He testified that he read the agreement to Defendant and that Defendant said he understood it. The agreement provided in part as follows:

> In performing the investigative functions detailed above, I understand and agree to the following: I understand that my assistance to the DEA and any statements that I may make to my Controlling Investigators are entirely voluntary.
> …
>
> The DEA does not promise or agree to any consideration by a prosecutor or a court in exchange for my cooperation, since any decision to confer any such benefit lies within the exclusive discretion of the appropriate prosecutor and court. However, DEA will consider (but not necessarily act upon) a request to advise the appropriate prosecutor's office or court of the nature and extent of my cooperation with the DEA. I voluntarily waive any privacy requirement in any event that in the DEA's discretion that they may be legally required to disclose my identity in court.
> …

> I understand that I have no immunity or protection from investigation, arrest, or prosecution for anything that I say or do, except for activities specifically authorized by my Controlling Investigators pursuant to my cooperation with DEA. I agree to abide by the instructions of my Controlling Investigators and will not take any independent action on behalf of DEA or the United States Government.

The CSA was signed by Defendant, SA Davis, and TFO Orr. TFO Orr testified that Defendant did not make any statements at that meeting. At the hearing, Ms. Murrell testified that she had discussions with ADA Desmond regarding Defendant's ongoing cooperation while the state criminal case was pending. As a part of Defendant's work as a confidential source, TFO Orr stated that the investigation planned a controlled purchase by Defendant from Wells. Ultimately, Defendant never made any controlled purchases from Wells, and both TFO Orr and SA Davis testified that they learned from another confidential source that Defendant had talked to Wells and told him that the DEA was looking at them. Wells admitted to TFO Orr that Defendant warned him about the undercover buy. TFO Orr testified that this was considered a breach of Defendant's CSA, which led to the termination of his agreement. The form terminating Defendant's CSA was signed on July 6, 2018.

TFO Orr went on to testify that on April 18, 2018, he talked with the USAO about referring the case for federal prosecution. SA Davis also participated in the presentation of the case to the USAO. TFO Orr explained that the case was eventually assigned to AUSA Caryn Hebets for federal prosecution. Defendant was arrested on federal charges on October 4, 2018.

Defendant filed six objections to the R&R as follows:

1. Defendant objects to Judge Poplin's finding that Defendant did not have an informal grant of immunity when he made statements to agents during his March 2018 debriefings. The relevant facts and allegations are as follows:

Judge Poplin found that there was no statutory or informal agreement "that he would be immune from charges." Defendant states that his argument has never been that Defendant was granted immunity from any further criminal charges. Instead, his argument is that he had an agreement with the state prosecutor and the federal agents running this case that any statements he made during his cooperation, including any proffer sessions, would not be used directly against him in a subsequent criminal prosecution. Accordingly, Defendant requests that this Court enforce this informal grant of immunity, "consistent with the prevailing practices in this district and with common sense, and suppress the statements made by Mr. Stanton during his proffer in furtherance of his ongoing cooperation with the Government."

Defendant argues that the Sixth Circuit has recognized that a cooperator making self-incriminating statements to law enforcement agents can be granted a form of informal immunity "by way of assurances by prosecutors, either orally or by letter," in which the prosecutor will agree not to later use those statements against the cooperator. *United States v. Turner*, 936 F.2d 221, 223-24 (6th Cir. 1991). However, Defendant then fails to provide information that the prosecutors assured Defendant he had informal immunity. Instead, Defendant argues that there is proof of an informal agreement based on conclusory evidence. For example, Defendant argues he received informal immunity based on: ADA Desmond's testimony about how he handles statements from cooperators generally; Defendant's hesitance to "discuss a lot of details" over concern that his statements might be used to bring new charges against him after the alleged informal agreement was in place; Ms. Murrell's testimony that she **usually** makes a "blanket disclaimer" at the beginning of these meetings; and Ms. Murrell's belief that law enforcement would not use Mr. Stanton's statements.

Defendant's arguments are conclusory and do not prove Defendant had an agreement with the prosecutor and agents running this case that any statements he made during his cooperation would not be used directly against him in a subsequent criminal prosecution. The evidence does not show that there was such an agreement in place. Therefore, Defendant's objection is **OVERRULED**.

2. Defendant objects to Judge Poplin's finding that Rule 410 of the Federal Rules of Evidence does not apply to the statements Defendant made during his March 2018 debriefings on the grounds that they did not involve "an attorney for the prosecuting authority" and did not occur in the course of plea negotiations. Defendant asserts that Rule 410 applies to bar his statements due to the level of involvement of ADA Desmond in the alleged plea negotiation process. Defendant essentially repeats his earlier claims as to why ADA Desmond played a significant and active role in the investigation.

This Court agrees with Judge Poplin's findings. The Court finds that ADA Desmond's involvement did not rise to the level necessary to constitute involvement of an attorney for the prosecuting authority. Therefore, Defendant's objection is **OVERRULED**.

Defendant also objects to Judge Poplin's findings that there was "no evidence presented demonstrating the officers who spoke with [Defendant] were authorized to conduct plea negotiations or indicated to Defendant that they were authorized to negotiate a plea." Defendant argues that the following circumstances reflect "a significant degree of authority and control over the ultimate resolution of Mr. Stanton's case." First, Special Agent Davis communicated with Defendant's probation officer to prevent revocation of his probation. Second, ADA Desmond indicated he would consider the recommendation of the officers when deciding the outcome of Defendant's case

In *United States v. Swidan*, relied on by Defendant in this objection, the Court found that defendant's expectation that he was negotiating a plea was reasonable because the agent took defendant's plea offer to the AUSA and acted as a middleman between the AUSA and the defendant throughout the negotiations. *United States v. Swidan*, 689 F. Supp. 726, 729 (E.D. Mich. 1988). Additionally, the agent's disclaimer of his ability to bargain was "so couched as to elicit a continued response" that the defendant's expectation that he was negotiating a plea deal was not unreasonable. *United States v. Swidan*, 689 F. Supp. 726, 729 (E.D. Mich. 1988). Moreover, the agent did not discourage the defendant from engaging in plea negotiations but instead "encouraged him to make his offer." *Id.*

In *United States v. Bridges,* which Defendant also relies on, the Court suppressed a statement made by the defendant. That statement was suppressed because, among other reasoning, "it was made in response to a direct question by a government agent whose conduct, however unintentionally, created the appearance of authority to initiate negotiations, authority that the government agent **did not clearly and explicitly disclaim**." *United States v. Bridges*, 46 F. Supp. 2d 462, 467 (E.D. Va. 1999), *aff'd,* 217 F.3d 841 (4th Cir. 2000) (emphasis added).

In *United States v. Harris*, also relied on by Defendant, the defendant, who had a ten-year history of cooperation with the local joint task force, initiated a conversation with an agent of the task force in order to bargain to be charged in state court rather than federal court. *United States v. Harris*, 657 F. Supp. 2d 1267, 1273 (N.D. Fla. 2009). The Court found that the defendant's expectation that the Agent had authority to negotiate the bargain they reached was informed by his prior relationship in which other officers delivered exactly the sort of bargains Defendant requested of the Agent. *United States v. Harris*, 657 F. Supp. 2d 1267, 1274 (N.D. Fla. 2009). Therefore, the disclaimer by the agent that he lacked authority to negotiate the plea did not

make the defendant's expectation unreasonable. *Id.*

The facts and circumstances faced by the cooperating defendants in the above cases are entirely different than the circumstances here. Unlike in *Swidan*, the law enforcement officials did not encourage Defendant to engage in plea negotiations nor did they ferry offers to the prosecuting authority. Moreover, unlike the agent in *Bridges*, the officials here did explicitly and clearly disclaim any and all authority. Finally, unlike the defendant in *Harris,* Defendant lacks a ten-year history with the officials that might make Defendant's expectation reasonable that he was engaged in negotiations for a plea even though the officials clearly made such a disclaimer. Therefore, Defendant's objection is **OVERRULED.**

Defendant also objects to Judge Poplin's characterization that "the agents' actions and communications with Defendant can be characterized as typical conduct involved in a continued law enforcement investigation, rather than a meeting with agents authorized to negotiate on behalf of a prosecutor or to determine if the Government was interested in starting plea negotiations." Defendant argues "there is nothing at all typical about the Government using statements made by a target during a cooperation proffer with federal agents to later indict and prosecute that target in federal court."

Defendant has not proven that either of the March meetings at issue were proffer sessions. In fact, SA Davis testified that there were no discussions between he and Ms. Murrell about whether the meeting would be a proffer session. This Court agrees with Judge Poplin's finding that Defendant was not engaged in plea bargaining during the meetings at issue. Ultimately, this Court agrees with Judge Poplin's findings that the agents' actions and communications with Defendant were typical conduct of agents carrying on an investigation. Therefore, Defendant's objection is **OVERRULED**.

3. Defendant argues that his statements were not made voluntarily and objects to the finding that his statements were voluntary. Defendant specifically argues that the promises and assurances by law enforcement that they were not looking to "jam him up more" or use Mr. Stanton's statements against him were coercive because the agents lacked the authority to determine whether to bring charges and because they later used Mr. Stanton's statements against him. And these false assurances were "sufficient to overbear the defendant's will" and were the "crucial motivating factor in the defendant's decision to offer the statements." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

Ms. Murrell and SA Davis testified that they attributed different meanings to the agents' response that they were not looking to "jam [Defendant] up more." SA Davis stated that he interpreted this to mean that Defendant would receive credit for his cooperation, but it was unclear how much credit he would receive. The agents testified that they never agreed that Defendant's statements would not be used against him. On the other hand, Defendant asserts that Ms. Murrell informed him that his statements would not be used against him, however, at no point did she obtain confirmation of this alleged belief from the officers. Ms. Murrell testified that SA Davis never told her "in those specific words" that Defendant would not face federal charges. Ms. Murrell also does not have notes to verify her claim that she asserted to the officers that Defendant's statements would not be used against him. Similarly, in her email correspondence with the officers on March 6th, Ms. Murrell did not obtain verification that Defendant's statements would not be used against him.

Following the debrief on March 8th, Defendant signed the CSA which clearly explains that he was aware that he has no immunity or protection from prosecution for anything that he says or does that could implicate him in a crime, and that the DEA would consider a request to advise the

appropriate prosecutor's office of the level of cooperation. The CSA specifically explains that "[t]he DEA does not promise or agree to any consideration by a prosecutor or a court in exchange for [Defendant's] cooperation, since any decision to confer any such benefit lies within the exclusive discretion of the appropriate prosecutor and court." It also states that "[Defendant] understand[s] that [he has] no immunity or protection from investigation, arrest, or prosecution for anything that [he says or does], except for activities specifically authorized by [his] Controlling Investigators pursuant to [his] cooperation with DEA."

Due to all the above stated reasons, the Court finds that Defendant's challenged statements to law enforcement were voluntarily provided. Therefore, Defendant's objection is **OVERRULED**.

The remaining three objections all pertain to the arrest of Defendant at his residence on October 4, 2018. The relevant facts pertaining to these three objections are as follows: After Defendant was arrested on state charges of possession of marijuana with intent to resell, a federal grand jury returned an indictment charging Defendant with one count of conspiracy to distribute 1000 kilograms of marijuana and one count of conspiracy to commit money laundering. During Defendant's October 4 arrest at his residence on these federal charges, law enforcement conducted a search of the house and seized a duffel bag of U.S. currency and other items of evidence. Defendant seeks to suppress and bar admission of the currency and other items seized. Specifically, Defendant argues that the initial search of the residence was not justified as a protective sweep; the unlawful search of the residence tainted the subsequent consent to search given by Defendant's fiancé, Ms. Halie Norton, and her consent was otherwise involuntary; and Ms. Norton lacked the authority to consent to the search and seizure of the duffel bag.

4.     Defendant objects to Judge Poplin's findings that Ms. Norton provided consent for law enforcement to perform an initial sweep of the premises. "The Fourth Amendment permits a search without a warrant if valid consent to search is given." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). At issue is whether Ms. Norton's consent to perform an initial sweep to look for other individuals within the home was given voluntarily. This Court finds that Ms. Norton's statement was not an "expression of futility" to the officer's demands as the Sixth Circuit found in *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Instead, her response of "[y]ou're more than welcome to take a look" clearly provided her consent to search the residence to see if any other individuals were present

Defendant also argues that the officers on the scene placed Ms. Norton under tremendous pressure and that pressure forced Ms. Norton to acquiesce to the officer's demands. Ms. Norton testified that the officers only pointed a gun at her when they initially entered the residence. Given the facts here, "this was a reasonable precaution, not a coercive gesture." *United States v. Scott*, 578 F.2d 1186, 1189 (6th Cir. 1978). Moreover, given that the entry was peaceful, no guns were drawn when Ms. Norton gave her consent to search the residence, and her consent was given while inside her home when she was "really calm," Ms. Norton's consent was not given under tremendous pressure to acquiesce to the officer's demands.

As part of Defendant's Fourth Objection, Defendant also disagrees with Judge Poplin's finding that law enforcement did not exceed the scope of the safety sweep. Specifically, Defendant alleges that "TFO Standefer reached under the bed to look inside the duffel bag" when he was conducting the safety sweeps. Defendant misconstrues the testimony of TFO Standefer. TFO Standefer did not testify that he reached under the bed to look inside the duffel bag. TFO Standefer testified that when they were clearing the bedroom, he noticed there was a duffel bag under the

bed. The flap of the bag was covered but not closed or zipped, and he saw money in the bag. TFO Standefer further stated that the bag was located at the corner of the bed and that he moved it to make sure no one was hiding under the bed, and then continued with the protective sweep. His purpose for looking under the bed was to ensure that no one was hiding there. A protective sweep is an inspection of only those areas "where a person may be found." *Maryland v. Buie*, 494 U.S. 325, 335–36 (1990). Searching under the bed is proper as it is a reasonable location where a person may be hiding. *See United States v. Meredith*, 107 F.3d 872 (6th Cir. 1997). Therefore, Defendant's objection is **OVERRULED**.

5. Defendant objects to Judge Poplin's finding that Ms. Norton voluntarily consented to a search of the entire residence after law enforcement's initial sweep. The Court disagrees. In Defendant's objection, he cites to *United States v. Tatman*, 397 F. App'x. 152 (6th Cir. 2010). Judge Poplin already addressed *Tatman* and differentiated the circumstances faced here as compared to the ones in that case. This Court will not duplicate Judge Poplin's well-reasoned findings but will address similar issues.

In *Tatman*, the Sixth Circuit held that the consent to search the residence provided by the defendant's wife was involuntary. *Id.* at 165. That court's holding was based on several facts that do not exist here. For example, in *Tatman*, the defendant's wife "signed the consent form in the middle of the night, after [a] domestic dispute with [the defendant], and just after [the defendant] was taken in handcuffs into the back of a police cruiser." 397 F. App'x at 165. Therefore, the Sixth Circuit found that "it seems quite likely that [the defendant's wife] did not even read this statement contained in the consent form, let alone intelligently consider its meaning." *Id.*

Here, Ms. Norton and Defendant did not have a chaotic and emotional domestic disturbance in the middle of the night that could have distracted Ms. Norton from failing to realize

16

that she was consenting to a search. Ms. Norton was described as cooperative and extremely nice throughout the arrest and search. Ms. Norton testified that the agents were nice and polite. Importantly, she described herself as being "really calm" during this incident. Additionally, the officers holstered their weapons, removed their tactical gear, and reviewed the consent to search form with Ms. Norton on the couch inside her home. Further, "[i]t is well-settled that the agent's statements to the effect that he would obtain a warrant if [the defendant] did not consent to the search does not taint [the subsequent] consent to a search." *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998). Accordingly, this Court finds that Ms. Norton voluntarily gave consent for law enforcement to search the residence, and this consent was not obtained through duress or coercion. As such, Defendant's objection is **OVERRRULED.**

6. Defendant objects to Judge Poplin's finding that Ms. Norton had actual authority to consent to the search and seizure of the duffel bag found under Mr. Stanton's side of the bed. Defendant also contends that Ms. Norton never consented to a seizure of the bag. And even if Ms. Norton had authority to allow law enforcement to search the bag, Defendant avers Ms. Norton never had authority to consent to the seizure of the bag.

"[W]hen the government seeks to justify a warrantless search by proof of voluntary consent, in the absence of proof that consent was given by the defendant, it 'may show that permission to search was obtained from a third party who possessed common authority or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005) (quoting *United States v. Matlock*, 415 U.S. 164, 171–72 (1974)). Common authority exists when people have mutual use of the property and joint access or control to the extent "that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right and that the others have assumed the risk that one of

17

their number might permit the common area to be searched." *Id.* (quoting *Matlock*, 415 U.S. at 171, n.7). The Sixth Circuit has made it clear that cohabitating girlfriends have common authority over a residence shared with their boyfriend. *United States v. Penney*, 576 F.3d 297, 308 (6th Cir. 2009) (the Sixth Circuit has "confirmed a number of times that a live-in girlfriend has common authority over the premises wherein she cohabits with a boyfriend."). Therefore, given that Defendant and Ms. Norton were engaged, cohabitating, and raising their child together in the residence at issue, Ms. Norton maintained common authority to consent to the search.

Moreover, Ms. Norton had common authority over the duffel bag. "A valid consent to search [a] closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes." *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005). Defendant failed to close or lock the container as evidenced by the fact that TFO Standefer testified he was able to see that there was cash in the duffle bag while moving it to search under the bed. Therefore, it was not "zipped closed" like in *Waller*, which provided Ms. Norton with common authority over the bag. Ms. Norton had access to the bedroom and Defendant did not seal or lock the duffel bag. He left it under the bed in the bedroom that he shared with Ms. Norton. Defendant therefore failed to take actions that would signify that Ms. Norton did not have access to the duffel bag. Ultimately, Ms. Norton had common authority over the duffel bag, as it would be "reasonable to recognize" that she, as a co-inhabitant, had "the right to permit the inspection in [her] own right" and that Defendant assumed the risk that Ms. Norton would permit the duffel bag to be searched. *Matlock*, 415 U.S. at 171 n.7.

Finally, although Defendant argues that Ms. Norton never had authority to consent to the seizure of the duffle bag, Defendant fails to cite to any case law supporting this argument. The Court has not found any supporting law. Therefore, Defendant's objection is **OVERRULED.**

After a careful review of the record, the court is in complete agreement with the magistrate judge's recommendation that Defendant's Motion to Suppress Evidence [R. 46] and Motion to Suppress Statements [Doc. 64], as amended [Doc. 77] be denied. Accordingly, the court **ACCEPTS IN WHOLE** the Report and Recommendation under 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). It is **ORDERED**, for the reasons stated in the Report and Recommendation, which the court adopts and incorporates into its ruling, that Defendants motion to suppress evidence [R. 46] and Motion to Suppress Statements [Doc. 64], as amended [Doc. 77] is **DENIED.**

_____
**CHIEF UNITED STATES DISTRICT JUDGE**